In re the MARRIAGE OF James M. HUNT, Petitioner–Appellant,

and

Karen L. Hunt, Respondent–Respondent,

Dr. Jack G. Hunt and Shirley Hunt, Third–Party Respondents– Appellants.

Nos. 20382, 20383.

Missouri Court of Appeals, Southern District, Division One.

Nov. 18, 1996.

Jasper N. Edmundson and Sheila Viets, Edmundson, Hopkins & Ellis, Poplar Bluff, for Appellants Dr. J.G. Hunt & Shirley Hunt.

Thomas David Swindle, Dale E. Nunnery, Swindle & Nunnery, Doniphan, for Appellant James M. Hunt.

Siegrid Smith Maness, Shawn Boyd, Maness & Miller, Doniphan, for Respondent Karen L. Hunt.

PREWITT, Judge.

James M. Hunt (Husband), his father, Jack G. Hunt, and stepmother, Shirley Hunt, appeal from a judgment dissolving Husband's marriage with Karen L. Hunt (Wife) and granting other relief and obligations. The appeals were consolidated.

Husband and wife were married in Doniphan, Missouri, on July 22, 1977. They had no children. The couple separated in May of 1989. At the time they were married, and for several years thereafter, Wife required

insulin shots to control her diabetes. Other than that, she was in reasonably good health.

Due to Husband's employment, they relocated twice early in their marriage. Wife worked as a nurse's aide, an office clerk, and a food-service worker. Throughout their marriage, Husband was employed by his father in various enterprises in which his father was involved.

In 1985, the couple returned to Doniphan where Wife began working at a bowling alley and a radio station, both owned by Husband's father. In July of 1985, Husband and Wife purchased a home and eight acres in Ripley County, Missouri, for $30,000. To finance this purchase, the couple borrowed $25,000 from husband's father, and $10,000 from husband's life insurance policy.

In August of 1986, Husband and Wife entered into an oral agreement with Husband's father and step-mother to purchase the bowling alley where Wife was employed. Arrangements concerning the purchase were never reduced to writing. The parties agree that the initial purchase price was $150,000, later reduced to $75,000 in 1987. All parties testified that monies for the purchase of the bowling alley were to come from annual monetary gifts received by the couple from Appellants Jack Hunt and Shirley Hunt, but variances exist regarding the amounts ultimately applied toward the purchase price of $75,000. Wife testified that $40,000 had been applied toward the purchase price. Husband testified that the balance on the loan was somewhere between $34,000 and $35,000, and his financial statement indicated an indebtedness on the bowling alley in the amount of $41,019.20 as of May 17, 1992. Shirley Hunt, Husband's step-mother, was "almost positive" that $30,000 had been applied toward the principal.

On November 21, 1986, Husband signed a promissory note in the amount of $175,000.00 in favor of Jack Hunt and Shirley Hunt, for the purpose of constructing and initiating the operation of a radio station. Although Wife was aware of plans for the couple to build and operate such a station, she did not sign the note, and testified that she had no knowledge until the dissolution proceedings were under way that Husband had done so. Hus-

band's testimony at the dissolution hearing was vague concerning the balance he owed on this promissory note. His "Liabilities and Capital Balance" statement filed with the court lists the balance on said note, as of December 31, 1990, to have been $62,882.05; whereas, his "Income and Expenses Statement" indicated that the balance of said note, as of March 17, 1992, was $93,522.05.

In September of 1987, Husband and Wife purchased 78 acres in Mountain View for $24,500, intending to build a radio station and tower there. Both testified that the funds for the purchase of the land were provided from "gift money" received from Appellants Jack Hunt and Shirley Hunt. Construction of the station and tower did not begin until after the couple separated. In March of 1990, the station began operation. Husband was station manager until "the early part of 1992."

In March of 1988, James and Karen refinanced the loan on their home, borrowing $50,549.33. The house was appraised at that time for $40,000.00. Proceeds from the loan were used to repay Dr. Hunt ($25,000) and husband's life insurance policy ($10,000), as well as consolidation of other debts of the couple.

In 1986, 1987, and part of 1988, Husband and Wife worked together operating the bowling alley, until Wife's health failed. Thereafter, Husband continued to manage the business. Wife developed serious health problems due to the progression of her diabetes. In June of 1988, Wife underwent heart surgery, and in October of that same year had laser surgery on her eyes. Her eyesight did not improve following the surgery.

In February of 1989, without the couple's permission or any prior knowledge on their part, the note secured by a deed of trust on their home was paid by Shirley Hunt. The amount of the pay-off was $50,024.68. Husband testified that following the pay-off arrangements were made with his step-mother for repayment of that amount and a schedule was established for monthly payments, including interest, to be paid by the couple to Appellants Jack Hunt and Shirley Hunt.

Both Shirley Hunt and Husband testified that Husband signed a $50,000 promissory note in favor of Jack Hunt and Shirley Hunt. Husband's evidence indicated that the $50,000 "borrowed from Jack and Shirley Hunt" was intended to pay off the house, the couple's 1986 Bronco, a personal loan on a computer, and the purchase money for the land in Mountain View. Wife stated that she had not been involved in any arrangements to repay the amount her husband's step-mother had paid and had never been asked to sign a promissory note.

Husband stated that 11 payments had been made to his father and step-mother pursuant to their agreement. Shirley Hunt testified that she had received 16 payments, that the principal balance owed on the note was $48,163, and that she had not received any payments after June 27, 1990. At the time of the dissolution hearing, Wife and her father and step-mother were residing in the home.

In April of 1989, Wife's physical condition required that she undergo dialysis treatments. (Husband testified that dialysis began approximately one year prior to their separation.) The following month, Wife was hospitalized in Memphis with peritonitis, an infection attributed to a lack of proper care of her dialysis equipment. On Memorial Day weekend, while Wife was in the Memphis hospital and on dialysis full time, Husband informed her that he wanted his freedom, that he could no longer provide the care her health required, and he wanted a divorce. Husband called Wife's father from the hospital and arranged for him to come and take over the care of his daughter.

Husband testified that in February or March of 1988, he began a sexual relationship with another woman with whom he had been working. He moved in with her in August or September of 1989. Since his separation from his wife, he has fathered two children with this woman. This was part of the misconduct of Husband, as found by the trial court. No misconduct of Wife was alleged or found.

During pre-dissolution hearings, the trial court ordered and Husband agreed to pay temporary maintenance and Wife's medical insurance premiums. Husband made some payments, but at some point stopped. Wife's insurance lapsed, and she was unable to reobtain insurance because of her poor physical condition. This, in turn, led to her inability to apply for an organ transplant that could have potentially eliminated her diabetes. Wife made a motion in which she asked the trial court to cite Husband for contempt of its order regarding temporary maintenance. The trial court allowed the motion to be heard during the dissolution proceedings.

The trial court, in its findings of fact, concluded that Husband was "guilty of marital misconduct, both before and after the marital separation, which has done severe financial, physical and emotional damage to [Wife]." That misconduct, according to the trial judge's findings, included the following:

> Plaintiff, James M. Hunt, mistreated respondent before the separation by leaving her alone and unattended while she was very sick, blind, in a semi-conscious state and was unable to move around on her own. He also mistreated her by allowing her to develop peritonitis in her dialysis tubing. Further, mistreatment occurred when he took her to a hospital in Memphis, Tennessee, admitted her there with peritonitis, then informed her he was leaving her and wanted a divorce. Petitioner's misconduct also involved an affair which began at least two years before the separation of the parties and out of which two children have been born since the separation.

Prior to the final hearing, Wife moved for and the trial court granted joinder of Jack Hunt and Shirley Hunt, apparently because of their alleged interest in several pieces of property at issue in the dissolution action, including the marital residence, a bowling alley, and a radio station situated on Husband and Wife's land. Judgment was entered July 11, 1995.

The scope of our review of this judge-tried case is established by Rule 73.01(c), as construed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The decree of the trial court will be sustained unless there is *no* substantial evidence to support it, unless it is

against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *In re Marriage of Vinson,* 839 S.W.2d 38, 42 (Mo.App.1992). We view the evidence and permissible inferences therefrom in the light most favorable to the decree, disregarding all contrary evidence and inferences, mindful that credibility of the witnesses and the weight to be given to their testimony was a matter for the trial court, which was free to believe none, part or all of their testimony. *Id.* at 43.

### Point I.

■ Appellants' first point contests the trial court's award of the radio station to Wife:

The trial court erred in characterizing radio station KXOZ with all improvements thereon, including equipment and personal property as marital property because the radio station was not acquired by the parties during the course of the marriage in that said property was held in an equitable purchase money resulting trust for the benefit of [Jack Hunt and Shirley Hunt].

Appellants refer to testimony that the station license was put in Husband's name because of Federal Communications Commission regulations which prohibited Jack Hunt from owning a radio station within a certain distance of another station owned by him. There was testimony that indicated that the land for the station was purchased out of money originally received by Husband and Wife as a gift from Jack Hunt. The trial court, in any case, was free not to believe the testimony referred to by Appellants.

The general rule in Missouri when dividing property by dissolution proceeding is that property acquired by either spouse during the marriage is classified as marital. § 452.330, RSMo 1994; *In re Marriage of Johnson,* 856 S.W.2d 921, 924 (Mo.App.1993). Appellants argue the radio station was never actually acquired by Husband or Wife because it was held in a resulting trust in favor of Appellants Jack Hunt and Shirley Hunt.

■ A resulting trust is one implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. *Prange v. Prange,* 755 S.W.2d 581, 582 (Mo.App.1987). There must be clear and convincing evidence of the resulting trust. *Tomasovic v. Tomasovic,* 845 S.W.2d 661, 664 (Mo.App.1992).

■ A resulting trust arises where property is transferred under circumstances that raises an inference that the person who makes the transfer or causes it to be made did not intend the transferee to take the beneficial interest in the property. *Rackley v. Rackley,* 922 S.W.2d 49, 51 (Mo.App.1996).

■ It is true, as Appellants state, that generally where one pays the purchase price for land with legal title taken in another, a presumption arises that the latter holds the property under a resulting trust for the payor. *In the Estate of Kling,* 736 S.W.2d 65, 67 (Mo.App.1987). However, this theory assumes that one who provides the purchase money intends to receive the benefits of the purchase. Absent evidence to the contrary, it is presumed that the payor did not intend to make a gift. *Id.* Here, however, there was evidence that the land was bought with money given as a gift by Jack and Shirley Hunt and, in addition, evidence from Husband that at least part of the money was a loan. A loan is wholly inconsistent with the theory of a resulting trust. *Parnell v. Sherman,* 899 S.W.2d 900, 904 (Mo.App.1995).

■ Where a parent pays for property that is conveyed to his children, an inference or presumption of gift is raised and the burden is on the parent to prove that a gift was not intended. *Prange,* 755 S.W.2d at 593.

In its findings of facts and conclusions of law, the trial court found Husband and Wife purchased 78 acres of land in Mountain View for $24,500 in 1987, and that in 1989 a radio station was built on the land with money supplied by Husband's father. The court also noted that Husband testified that he signed a promissory note on a loan for the construction of the radio station and that he had made payments on that note.

Appellants' reliance on *Ravenscroft v. Ravenscroft,* 585 S.W.2d 270 (Mo.App.1979) is unavailing. In that case, the court made a

point of noting that "no contribution toward the acquisition or maintenance" of the property in question was made by the party holding the property in a resulting trust. *Id.* at 272. Here, there was evidence that Husband made payments towards the construction of the radio station and that both Husband and Wife eventually intended to benefit financially from the station.

There was no clear and convincing evidence of a resulting trust, and the trial court was justified in characterizing the radio station as marital property. Point I is denied.

### Point II.

■ For their second point, Appellants claim the trial court wrongly characterized a bowling alley as marital property, contending this property was repossessed by Jack Hunt and Shirley Hunt after Husband and Wife failed to make payments required under an oral agreement.

The trial court found that Husband and Wife entered into an agreement to purchase the bowling alley from Appellants Jack Hunt and Shirley Hunt, and paid a substantial part of the purchase price under the agreement. The record also indicates Husband believed he owned the bowling alley and filed tax returns and other legal documents claiming ownership up to shortly before the dissolution proceedings. There was little evidence of a change in his relationship to the property since acquiring it.

Other than the purchase price, the parties apparently agreed on few of the details of the transaction. Appellants do not refer to and the record does not contain evidence that the parties established or intended to establish the right of Jack Hunt and Shirley Hunt under the agreement to "repossess" the bowling alley upon the alleged failure to pay the remaining amount. *Cf., e.g., Webb v. American Family Financial Services,* 667 S.W.2d 435, 442 (Mo.App.1984).

Considering this record, we are unpersuaded by Appellants' argument that Jack Hunt and Shirley Hunt "canceled" the agreement to transfer the bowling alley to Husband and Wife or considered payments under the agreement delinquent. The trial court was justified under these facts in characterizing the property as marital.

### Point III.

■ Appellants contend in their third point that the trial court erred by not assessing a lien in favor of Jack Hunt and Shirley Hunt on the marital residence in that they "satisfied an existing note and deed of trust on the marital property and the [Husband and Wife] acknowledged the satisfaction of the debt and agreed to repay the debt."

The trial court found that Husband and Wife purchased the marital residence with substantial assistance from Appellants Jack Hunt and Shirley Hunt. According to the court's findings, Husband and Wife later refinanced the home, but upon learning that higher interest rates had caused the principal on the loan to reduce very little, Shirley Hunt "spontaneously paid off the bank with her and [Husband's father's] funds."

The trial court further found that Wife had not requested that the bank loan be paid off and had not signed a promissory note Husband later gave Jack Hunt and Shirley Hunt to repay them for paying off the loan. It concluded that the debt owed to Appellants Jack and Shirley Hunt, as evidenced by the promissory note, was Husband's separate debt "as he alone signed" it.

Appellants do not contest the allocation of the debt to Husband or the award of the home to Wife. This court perceives no reason why a lien should be placed on property of someone who has no debt to secure.

The precedents offered by Appellants in support of their point actually bolster Wife's contention that she should not be held accountable for the debt. In both *Locke v. Locke,* 901 S.W.2d 912, 916 (Mo.App.1995), and *In Re Marriage of Welch,* 795 S.W.2d 640, 643–44 (Mo.App.1990), the spouses were held to be accountable because evidence established that they had assumed the debts in question by expressly agreeing to assume them and making payments on them. Here, no such evidence was offered, and as the trial court found, "[n]o allegation was made by any party that [Wife] . . . ever assumed any

obligation to pay" the debt to Appellants Jack and Shirley Hunt. Point III is denied.

### Point IV.

For their fourth point, Appellants argue the $500 per month maintenance award to Wife was excessive in that Husband did not have the financial resources to pay it. The trial court has broad discretion in determining the amount of maintenance, and an appellate court will not interfere absent an abuse of discretion. *In re Marriage of Vinson*, 839 S.W.2d at 43.

Appellants cite *Ryan v. Ryan*, 810 S.W.2d 118 (Mo.App.1991), in which a $300 maintenance award was reduced to a "nominal amount" despite the receiving spouse's disability. In *Ryan*, the appellate court recalculated the income and expenses of the husband and wife after adjusting amounts for certain items such as loan payments, living expenses, etc. *Id.* at 120.

Here, there is no indication that such a recalculation is necessary. The amounts and figures on which Appellants rely on appeal were those that were before the trial court when it formulated its award of maintenance.

Husband testified he received a monthly income of $1,000 and that he had two dependent children to provide for. He further testified that while difficult, he was able to provide $400 per month maintenance to Wife at the time of trial. Wife testified that her diabetes and related symptoms, including near blindness, prevented her from working and required her to pay for various medical expenses.

In its findings, the trial court carefully considered each factor relevant for the amount of maintenance, as set forth in § 452.335(2), RSMo 1974. In considering the "seventh factor" (§ 452.335.2(7)), the trial court noted that the Wife "is blind, diabetic, has diabetic neuropathy in her feet and legs, has recently received a kidney transplant, has undergone bypass surgery and has high blood pressure." The trial court made specific findings as to the other factors as well.

Noting evidence of Husband's past income, work experience and continuing education in preparation for a career in optometry, the trial court concluded Husband "clearly has the capacity to earn more at the present time" and "his prospects for paying in the future, when he completes his educational goals certainly place petitioner in the capacity to pay respondent some much needed maintenance." *See Calicott v. Calicott*, 677 S.W.2d 953, 956 (Mo.App.1984)(approving consideration of a husband's past and present capacity to pay, as distinguished from his actual earnings, in determining amount of maintenance).

Under the standard of review applicable, and mindful that credibility of the witnesses and the weight to be given to their testimony was a matter for the trial court, we are unable to conclude that a maintenance award of $500 per month was an abuse of discretion.

### Point V.

Appellants contend in their fifth point that a disproportionate share of the marital property was awarded to Wife. The point states:

The trial court erred in its distribution of marital property because it awarded a disproportionate share of the marital property to Respondent, Karen Hunt, in that the trial court awarded to the Respondent, the marital home, the KXOZ radio station property, the marital vehicle, the FCC radio license, and her personal effects, while awarding the Petitioner all of the marital debt on the assets awarded to Respondent. In addition, the Petitioner was awarded all other marital debt and the only asset he was awarded was the Tower Lanes bowling center, which was improperly characterized as marital property, and his personal effects.

This point fails to state wherein and why the court's award was improper under the applicable law. A point relied on which does not comply with Rule 84.04(d) by stating "wherein and why" the trial court ruling is erroneous fails to preserve that issue for appellate review. *Newcomb v. Humansville R–IV School Dist.*, 908 S.W.2d 821, 832 (Mo. App.1995). Considering the point nonetheless, we find nothing in the record to dis-

suade us from affirming the trial court's division of the marital property.

■ The trial court is vested with considerable discretion in dividing marital property and this court interferes only if the division is so unduly weighted as to amount to an abuse of discretion. *In re the Marriage of Smith,* 892 S.W.2d 767, 769 (Mo.App. 1995). Just division of marital property does not have to be equal, particularly where one party has engaged in misconduct. *In re Marriage of Lewis,* 808 S.W.2d 919, 923 (Mo. App.1991).

Here, the trial court issued a judgment that detailed consideration of relevant statutory factors governing division of marital property, noting Husband's marital misconduct and Wife's blindness and diabetes. *See* § 452.330.1, RSMo 1994. Under these circumstances, the trial court did not abuse its discretion in dividing the marital property. Point denied.

*Point VI.*

■ Appellants claim in their sixth point that the trial court erred in characterizing the license to operate the radio station as marital property and awarding it to Wife in that "the court was without jurisdiction to transfer ownership of said license in that jurisdiction over FCC licenses rests exclusively with the Federal Communications Commission."

■ The FCC has been empowered by Congress, in the public interest, with exclusive jurisdiction over radio broadcasting. *Themy v. Seagull Enterprises, Inc.,* 595 P.2d 526, 530 (Utah 1979). Section 310(d) of the Federal Communications Act, 47 U.S.C.A., § 310(d) (1991), provides as follows:

> No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.

■ A state court could not, without approval of the Federal Communications Commission order a transfer of a license or, of any right granted thereunder. *Big League Broadcasting Co., Inc. v. Shedd–Agard Broadcasting, Inc.,* 313 So.2d 247, 249–50 (La.App.1975)(citing *Southern Broadcasting Corporation v. Carlson,* 187 La. 823, 175 So. 587, 589 (1937)). A state court does, nonetheless, have the power to adjudicate issues involving FCC licenses as long as the state court does not affirmatively interfere with the authority of the FCC to authorize the transfer, assignment or other disposition of licenses. *Themy,* 595 P.2d at 531.

In *Themy,* the Utah Supreme Court affirmed summary judgment in favor of a party (Themy) who had purchased a radio station, including all real estate and the license, from a seller who had initially sold the station and transferred the license, with FCC approval, to another buyer. When that buyer defaulted on payments to the seller, the seller exercised its right to declare buyer's interest forfeited and sold the station and license to Themy.

Because the FCC had approved transfer of the license to the original buyer, it was contended that the lower court was without power to adjudge the interest "in and arising out of" the original purchase agreement for sale of the broadcasting equipment and license. Rejecting this argument, the *Themy* court relied heavily on *Radio Station WOW, Inc. v. Johnson,* 326 U.S. 120, 65 S.Ct. 1475, 89 L.Ed. 2092 (1945). It noted that in that case, the U.S. Supreme Court declared that a state court had gone "outside its bounds when it ordered" parties litigating over a station license " 'to do all things necessary' to secure a return of the license" from one litigant to another. *Themy,* 595 P.2d at 531.

As pointed out in *Themy,* the court in *Radio Station WOW* explained that such an order would plainly require one party to ask the Commission for a transfer of a license and the other party not to oppose such transfer. *Radio Station WOW,* 326 U.S. at 130, 65 S.Ct. at 1481, 89 L.Ed at 2101. The decree would also probably disqualify the transferring party from applying for a new

license to operate a radio station on the same frequency in the same geographical area, should it become equipped to do so. *Id.* The order would thus impose impermissible restrictions not merely upon the private rights of parties but upon the licensing system which Congress established. *Id.*

However, the *Radio Station WOW* court went on to emphasize that a state court did have the power to direct transfer of property, even if it consists of licensed facilities and the transferee chooses not to apply for a license or the Commission refuses to grant it. It acknowledged that "[t]he result may well be the termination of a broadcasting station." *Id.*

Applying *Radio Station WOW* to the case before it, the court in *Themy* concluded that in deciding in favor of Themy, the lower court had not impinged upon the jurisdiction of the FCC, explaining, at 595 P.2d 526, 532, as follows:

> The judgment simply enforces the terms of the agreements providing for forfeiture upon default by the purchaser, and declares the owner of the interests in the radio station and license to be Themy. It does not require the parties to take any specific action regarding a retransfer of the license, as in *Radio Station WOW, Inc.* Significantly the judgment did not grant Themy's requested relief for "a mandatory injunction requiring ... defendants to assist plaintiff in obtaining transfer of the FCC license into plaintiff's name."

In this case, the judgment similarly did not include an order requiring Husband or Appellants Jack and Shirley Hunt to assist Wife in obtaining transfer of the FCC license. It merely awarded the license to Wife in its division of marital property. The judgment does not technically intrude on the Commission's jurisdiction to approve or reject transfer of the license upon application by Wife. The judgment may be properly interpreted as simply giving Wife an interest in the license. Whether Wife ultimately obtains the license is up to the FCC, and the trial court is without jurisdiction to do more than it has done with respect to the license. With that understanding, we deny this point.

## Point VII.

■ For their seventh point, Appellants challenge the trial court's award of back maintenance in the amount of $7,400 in that "no evidence was introduced proving the amount of back maintenance due and owing and the award of $7,400 is merely the result of conjecture and speculation."

The judgment indicates that the trial court found that Husband "willfully and without valid excuse failed to make certain temporary maintenance to respondent, and to continue in force (sic) her private medical insurance" and ordered him to pay "said arrearage in the sum of $7,400."

The $7,400 arrearage apparently included compensation for failed payments of Wife's medical insurance premiums. Appellants' quotation of Wife's testimony on which they rely in asserting that only a $5,300 amount was mentioned at trial is incomplete. The complete quote is: "I feel like Jim needs to pay me my $5,300 in back maintenance, and I feel that I should be compensated for losing my private insurance because there's no way I'm ever going to be able to get private insurance, not with a kidney transplant, diabetes, blindness, heart trouble. No insurance company is going to take me."

Without attempting to go into minute calculations, we note that the insurance premiums were $510 per quarter and are satisfied that the trial court was justified in awarding Wife the $7,400 in arrearage. This point is denied.

## Point VIII.

■ For their eighth point, Appellants claim the trial court erred in ordering the $500 per month maintenance to begin several months before the dissolution decree was issued in that "there is no legal authority to grant retroactive maintenance." In its decree of dissolution, dated July 11, 1995, the court ordered Husband to pay maintenance effective February 1, 1994.

Wife argues the beginning date for maintenance was properly set because the dissolution hearing was held on January 21, 1994, and that while Missouri law does not permit

awards of retroactive maintenance in dissolution decrees, there is precedent for beginning maintenance on the date of the dissolution hearing.

 A trial court lacks authority to grant retrospective maintenance. *In re Marriage of Tappan*, 856 S.W.2d 362, 370 (Mo.App. 1993); *Kessler v. Kessler*, 719 S.W.2d 138, 140 (Mo.App.1986). Section 452.335, RSMo 1994, authorizes the granting of maintenance "following dissolution of marriage." Whether the statute authorizes maintenance from the date of the dissolution hearing or the date of the decree has apparently not been directly addressed by Missouri appellate courts. A review of several dissolution cases suggests that most maintenance awards become effective on the date of the decree. *See, e.g., Salsbury v. Salsbury*, 848 S.W.2d 41, 44 (Mo.App.1993); *In re Marriage of Swofford*, 837 S.W.2d 560, 566–67 (Mo.App. 1992).

The cases and the statutes support Husband's contention that maintenance should have been made effective from the date of the dissolution decree, July 11, 1995. However, Husband had been ordered to pay $400 per month temporary maintenance. *See* § 452.315, RSMo 1994. Under the circumstances, an order directing Husband to continue the $400 per month temporary maintenance until the date of the decree is justified. *See, e.g., In re Marriage of Davis*, 821 S.W.2d 123, 124 (Mo.App.1991); *In re Marriage of Jirik*, 783 S.W.2d 177, 179 (Mo.App. 1990).

The decree is modified to provide that the $500 maintenance award be effective July 11, 1995 and that the temporary maintenance award of $400 per month be in effect until that date.

### Point IX.

 In their ninth point, Appellants return to the award of the radio station equipment to Wife. They again claim that the equipment was not marital property. As the basis for that claim, they rely not on the theory of resulting trust, as they did under their first point, but on the argument that the equipment and personal property of the station "were transferred to [Jack Hunt and Shirley Hunt] prior to trial in exchange for forgiveness of a promissory note."

Wife apparently concedes that the equipment and other station property were transferred to Jack Hunt and Shirley Hunt by Husband. However, if the equipment was marital property, Husband could not unilaterally transfer it and defeat Wife's interest. Wife further asserts that the trial court had jurisdiction to distribute the property because Husband's parents were party to the dissolution proceedings and thus had the opportunity to protect their rights.

Appellants have relied on their testimony which the trial court did not have to believe. As discussed under Point I, above, under the applicable standard of review, the trial court finding the radio station to be marital property suitable for division does not merit reversal. Point denied.

### Point X.

The tenth point asserts that the trial court erred in awarding interest at the rate of 12% per annum on arrearages of temporary maintenance and insurance coverage, "in that the award of interest at the rate of twelve (12%) percent exceeded the trial court's authority because the legal interest due upon any judgment or order of any court is no more than nine (9%) percent." Respondent Wife did not respond to this point in her brief. At oral argument, Wife's attorney conceded that this point is well taken. Accordingly, upon remand, the trial court is instructed to reduce the interest rate to nine percent per annum.

### Point XI.

For their eleventh and final point, Appellants claim the trial court erred in ordering Husband to pay $4,000 for violating the court's order regarding temporary maintenance and Wife's insurance coverage. They assert that "a fine in a civil contempt case under the circumstances of this case is improper because there was no evidence that the fine is compensatory or related to actual damages suffered by the respondent...." Wife claims the court imposed the $4,000 fine for criminal, not civil contempt.

The point raises two questions: first, whether the contempt in this case was criminal or civil; and second, what punishments are available for civil contempt.

■ In ascertaining which form of contempt was found the following criteria is used: (1) was there a private or public plaintiff; (2) did the contempt proceeding serve a punitive or remedial purpose; (3) were there special elements of contumacy; (4) was the proceeding conducted as a criminal or civil proceeding; and (5) did the defendant have the requisite intent for criminal contempt. *Chemical Fireproofing Corp. v. Bronska*, 553 S.W.2d 710, 715 (Mo.App.1977).

■ A contempt action is civil if it is instituted to preserve and enforce the rights of a private party to an action and to compel obedience to a judgment or decree intended to benefit such a private party litigant. *A.G. v. R.M.D.*, 730 S.W.2d 543, 545 (Mo. banc 1987)(characterizing as "civil" a contempt action to compel obedience regarding child visitation rights).

The trial court designation does not necessarily render the contempt criminal. *Saab v. Saab*, 637 S.W.2d 790, 792 (Mo.App.1982). We must rather look to the substance of the order to determine its true nature. *Id.*

■ Considering the above factors, we are satisfied that the contempt in this case was civil and not criminal. Prominent among the reasons for this conclusion are the civil nature of the proceeding and the private character of the parties. In a criminal contempt proceeding, the defendant must be advised of the charges against him, may not be required to testify against himself, and is presumed to be innocent until proven guilty beyond a reasonable doubt. *Bronska*, 553 S.W.2d at 714, n. 1. Here, the contempt proceeding was part of the dissolution proceeding, and the procedural safeguards required in a criminal proceeding were not apparent.

■ Having concluded the contempt was civil, we turn now to whether the fine imposed by the trial court was proper. The case law is relatively unclear with respect to the punishments available for civil contempt.

Some courts have sought to distinguish civil and criminal contempt by contrasting the "coercive" or "remedial" nature of civil contempt with the "punitive" character of criminal contempt. *See, e.g., Mo. Hosp. Ass'n v. Air Conservation Comm'n*, 900 S.W.2d 263, 266 (Mo.App.1995); *Wisdom v. Wisdom*, 689 S.W.2d 82, 86 (Mo.App.1985); *Redifer v. Redifer*, 650 S.W.2d 26, 28 (Mo. App.1983); *Bronska*, 553 S.W.2d at 715 (deeming the purpose of criminal contempt is to preserve the power and vindicate the authority and the dignity of the court, and to punish for disobedience of its orders). Building upon this notion, they have emphasized that the function of civil contempt is to provide a coercive means to compel the other party to the litigation to comply with relief granted his adversary. *Wisdom*, 689 S.W.2d at 86; *Redifer*, 650 S.W.2d at 28.

Regarding money sanctions for civil contempt, these courts have concluded that such sanctions function only to remedy the contempt and to coerce the contemnor to perform. *Wisdom*, 689 S.W.2d at 86. Thus, "[a]n outright fine is not appropriate for civil contempt." *Redifer*, 650 S.W.2d at 28. "Only a per diem fine that expires when the contemnor complies with the court's order is proper." *Id.*

This court, however, has had occasion to note that a fine may be appropriate as a punishment in civil contempt. *Smith v. Smith*, 743 S.W.2d 476, 479 (Mo.App. 1987)(but noting in context of imposition of a fine intended to coerce obedience to a court order); *Angell v. Angell*, 674 S.W.2d 147, 149 (Mo.App.1984). Moreover, "remedial punishment" options for civil contempt apparently include "compensatory fine[s], payable to the complainant." *Odom v. Langston*, 358 Mo. 241, 213 S.W.2d 948, 951–2 (1948); *State of North Dakota ex rel. Young v. Clavin*, 715 S.W.2d 25, 26 (Mo.App.1986). *See also* 17 C.J.S. *Contempt*, § 94 (1963), and 17 Am. Jur.2d *Contempt*, § 237 (1990).

Because of the discretion normally accorded to a trial court in issuing and fashioning contempt orders, *International Motor Co., Inc. v. Boghosian Motor Co.*, 870 S.W.2d 843, 847 (Mo.App.1993), fines for civil contempt need not be limited to per diem fines that

expire upon compliance with the order, but may be compensatory. *North Dakota ex rel. Young,* 715 S.W.2d at 26. *See* 17 Am.Jur.2d *Contempt,* § 230 (purging of civil contempt by compliance is not always possible).

Appellants correctly assert, however, that whether per diem or compensatory, fines for civil contempt must be related to the actual damage suffered by the injured party. *Smith,* 743 S.W.2d at 479; *Angell,* 674 S.W.2d at 149; *North Dakota ex rel. Young,* 715 S.W.2d at 26. In this case, the act for which the court found Husband to be in contempt—willful failure to maintain Wife's medical insurance—caused Wife to lose her medical insurance and significantly hindered her chance to rid herself of diabetes with an organ transplant. Wife testified that without insurance, such a transplant would cost her thousands of dollars.

Under these circumstances, a compensatory fine of $4,000 would be justified, and apparently it was this amount listed in the final decree, rather than $1,000 listed in the findings of facts, which was intended by the trial court. That is the way the parties treat it. To be sure, however, the trial court should indicate the amount intended upon remand.

The judgment of the trial court is affirmed except as indicated under Points VIII, X, and XI. The judgment is remanded for the trial court's modification as directed under those points.

BARNEY, P.J., and GARRISON, J., concur.