Pamela S. COMNINELLIS, Appellant–Respondent,

v.

George COMNINELLIS; Respondent–Appellant

Olympic Industries, GNC Holdings, and Impex International, Plaintiff.

Nos. WD 63440, WD 63495.

Missouri Court of Appeals, Western District.

Oct. 26, 2004.

John G. Dorsey, Claycomo, MO, for Plaintiff.

Thomas E. Hankins, Gladstone, MO, for Appellant-Respondent.

James D. Boggs, Kansas City, MO, for Respondent-Appellant.

Before THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN and RONALD R. HOLLIGER, JJ.

THOMAS H. NEWTON, Presiding Judge.

This is the second appeal in a marital dissolution action. The only issues on this appeal involve the trial court's decision to award statutory periodic maintenance and to award it from the date of the mandate issued following the first appeal. We conclude that the trial court did not abuse its discretion in awarding maintenance in this case. We further conclude, however, that the trial court should have made the maintenance award effective as of the date of the original dissolution decree. Because we have the authority to give the judgment that the court ought to give, we make the award effective as of that date. In all other respects, the judgment of the trial court is affirmed.

## I. Factual and Procedural Background

George and Pamela Comninellis appeal from the trial court's judgment awarding Ms. Comninellis statutory periodic maintenance in the amount of $2,000 per month. This is the second appeal from the trial court's dissolution of the parties' marriage. After the trial court dissolved the marriage, the parties appealed from the judgment as it pertained to the property distribution and the decision not to award maintenance. This court reversed several aspects of the judgment as it pertained to the property distribution and also remanded the case so that the trial court could reconsider the decision not to award main-

tenance to Ms. Comninellis. *See Comninellis v. Comninellis,* 99 S.W.3d 502, 514–15 (Mo.App. W.D.2003) (*Comninellis I* ).

Following remand, the trial court held a hearing on the question of maintenance. Thereafter, the trial court issued a judgment resolving the property issues and it also reconsidered the question of maintenance. The trial court awarded statutory periodic maintenance of $2,000 per month to Ms. Comninellis and said:

> The Court finds that Pamela is unable to support herself through appropriate employment and lacks sufficient property, including property awarded to her in this proceeding, to provide for her reasonable needs. The Court further finds that George is well able to provide for his own financial needs and to contribute to the financial support of Pamela. The court further finds that while Pamela, in order to survive financially, has had to deplete the assets awarded to her in the Judgment of Dissolution, George has been able to live a comfortable lifestyle and has been able to pay his expenses without having to deplete his assets. Further, George has done this while paying to support two homes (one in Missouri and one in Florida) and while paying his attorney fees and other obligations as they become due. Pamela, on the other hand, has only one residence and, though she has depleted her assets and borrowed money in order to provide for herself financially, she has been unable to pay any of her attorney fees.

> George has been able to pay all of these obligations, as they come due, without having to sell his yacht (which he intends to do) and without having to sell his real estate. Pamela, on the other hand, has had to deplete the bank and investment accounts awarded to her, has had to borrow $25,000 from her Mother, and has been unable to pay anything towards her $25,000 attorney fee obligation.

> The Court finds that it is fair and reasonable for George to pay Pamela $2,000.00 per month as and for periodic, statutory, maintenance. The Court further finds that this award of maintenance should be made retroactive, but that this Court only has authority to make the award retroactive to the date of the mandate from the Court of Appeals (April 2, 2003).

Both parties appeal. Ms. Comninellis raises two points on appeal. First, she contends that the trial court misinterpreted and misapplied the law and abused its discretion by making the maintenance award effective as of the date of this court's mandate instead of the date of the trial court's original judgment. And, second, she contends that the trial court abused its discretion in awarding only $2,000 per month in maintenance because the evidence shows that she lacks sufficient property to provide for her reasonable needs and is unable to support herself through appropriate employment.

Mr. Comninellis raises one point on appeal. He contends that the trial court abused its discretion in awarding maintenance and attorney's fees. Although Mr. Comninellis mentions attorneys fees in his point relied on, he does not address attorney's fees in the argument section of his brief or cite any relevant authority on that issue. To the extent that he disputes the attorney's fee award, he has abandoned that issue on appeal and we do not address it. *See Coleman v. Gilyard,* 969 S.W.2d 271, 273 (Mo.App. W.D.1998).

## II. Standard of Review

 "This court will affirm the trial court's order unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or

applies the law." *Ritter v. Ritter*, 920 S.W.2d 151, 160 (Mo.App. W.D.1996). "This court reviews the evidence in the light most favorable to the dissolution decree, disregarding contrary evidence, and defers to the trial court even if the evidence could support a different conclusion." *Id.* This court reviews the trial court's maintenance award only for an abuse of discretion. *Id.*

## III. Analysis

### A. The Trial Court Did Not Abuse its Discretion in Awarding Maintenance

The trial court can award maintenance only if it finds that the spouse seeking maintenance: (1) lacks sufficient property, including marital property apportioned to her during the divorce, to meet her reasonable needs; and (2) is unable to support herself through appropriate employment or that she is the custodian of a child whose condition or circumstances make it appropriate that she not be required to seek employment outside of the home. § 452.335.1; *Hill v. Hill*, 53 S.W.3d 114, 115 (Mo. banc 2001). The spouse seeking maintenance has the burden of establishing these threshold requirements. *Childers v. Childers*, 26 S.W.3d 851, 854 (Mo.App. W.D.2000).

"To proceed under the statute, the court must first determine the reasonable needs of the spouse seeking maintenance ... and then determine whether the spouse is able to provide for these needs through use of property or appropriate employment." *McIntosh v. McIntosh*, 41 S.W.3d 60, 67–68 (Mo.App. W.D.2001) (internal citation omitted). "Once the court determines the reasonable needs of the spouse seeking maintenance, the court then determines the ability of the spouse to meet those needs through her earnings and investment income. . . ." *Id.* at 68. "If there is a disparity between her reasonable needs and her income, the court should consider that disparity in deciding whether maintenance is required." *Id.*

### 1. Ms. Comninellis' Reasonable Needs

"Reasonable needs" is the standard for determining the expenses properly allowable to a spouse seeking maintenance. *Nichols v. Nichols*, 14 S.W.3d 630, 636 (Mo.App. E.D.2000). "Reasonable needs" does not automatically equate to the marital standard of living. *Id.* The marital standard of living is merely a factor to be considered. *Id.* "Reasonable needs" is a relative term. *Brueggemann v. Brueggemann*, 551 S.W.2d 853, 857 (Mo. App.1977). "In a marriage of lengthy duration where one spouse has foregone career development, the marital standard of living may serve as an important guide in computing the spouse's reasonable needs. In a very practical sense it is frequently the best evidence of what the parties have together determined their 'reasonable needs' to be." *Id.*

"To prove claimed expenses, statements of income and expenses are routinely admitted and relied upon without further testimony or documentary support for each individual item." *Childers*, 26 S.W.3d at 855 (internal quotation marks and citation omitted).

Ms. Comninellis' most recent income and expense statement catalogued $6,632.33 in monthly expenses. Ms. Comninellis contends that these expenses exceed her income by over $5,000 per month and justify her request for a maintenance award to cover the shortfall. Mr. Comninellis, on the other hand, challenges the reasonableness of several claimed expenses. He states that her claimed expenses have increased from $5,094.25 since the first dissolution hearing.

Reviewing the evidence in the light most favorable to the dissolution decree and disregarding contrary evidence, we conclude that the trial court's determination is not against the weight of the evidence and that it is supported by substantial evidence. *See Ritter,* 920 S.W.2d at 160.

 The trial court made no specific findings regarding any of Ms. Comninellis' expenses. "Such findings are not necessary in the absence of a motion for findings of fact under Rule 73.01, however." *Taylor v. Taylor,* 12 S.W.3d 340, 346 (Mo. App. W.D.2000). Where neither party requests specific findings, we presume that the trial court "resolved all factual conflicts in favor of the result reached." *Id.* at 346–47. In such a case, "[a]ll fact issues . . . shall be considered as having been found in accordance with the result reached." Rule 73.01(c).[1]

Here, the trial court could have found that many of Ms. Comninellis' claimed expenses were excessive. For example, Ms. Comninellis listed $2,600 in monthly expenses for credit cards, recreation and gifts. Of this amount, $2,050 constitutes credit card payments, $300 constitutes spending on recreation, and $250 constitutes spending on gifts. Because the marital standard of living does not automatically establish the same level of need after divorce, expenses for items such as recreation and gifts may bear scrutiny. *Nichols,* 14 S.W.3d at 636 and n. 5 (trial court properly exercised its discretion when it determined that wife's claimed expenses for travel, recreation and gifts were at least twice the level required to sustain wife's "reasonable needs" in those areas). "[T]o the extent these items are predicated on duplicating the parties' lifestyle, this is unjustified." *M.A.Z. v. F.J.Z.,* 943 S.W.2d 781, 789 (Mo.App. E.D.1997) (wife's

claimed expenses of $3,000 per month for recreation and $3,000 per month for travel were not justified as continuation of marital standard of living and record was devoid of evidence to show that this "extraordinary" amount actually represented wife's own need for these items).

She also listed $1,650 per month for a luxury condominium at Crown Center, $250 per month in car maintenance expenses, $400 for food, $500 for clothing, $110 for "laundry and cleaning" and $200 for "beauty shop." The trial court could have scrutinized these items and found them excessive as well. There was evidence to suggest that the car maintenance expense was not correct. When cross-examined about this item, Ms. Comninellis said.

A. And I know that's conservative. I'm sorry about that, but—

Q. Two hundred fifty a month?

A. —I'm just trying to be reasonable.

Q. Two fifty a month, that would be what, three or four thousand dollars a year?

A. Two fifty, okay.

Q. I've gone through your check records, Ms. Comninellis.

A. Uh-huh.

Q. I didn't find any checks to any car dealer. Now you did supply me one receipt showing—

A. I might have put it on a credit card. I might have paid cash.

Q. Well, I've got all your credit cards, too.

A. I might have paid cash.

Q. You gave me some bills showing expenses for the automobile. The only thing I find—did I find anything in here for the Mercedes?

---

1. Unless otherwise indicated, all rule references are to Missouri Court Rules (2004).

A. Well, I just had it there the other day. It needs an oil gasket ring or something, and they told me that's going to be four hundred something; it needs a battery, which installed will be $225.

Q. For a battery?

A. Yes, sir. They said it was $125 to buy the battery because it's a big size or something. And if I want it installed, it's $225. You may call Aristocrat and ask them.

Likewise, there was evidence that Ms. Comninellis' employer picks up at least some of her expenses for food and shopping while she works. Ms. Comninellis testified that the airline provides her with $1.75 per hour to cover expenses while she is on layovers for "food, taxis, that kind of thing." She also testified that she uses the money to tip servants. It is not clear whether the money that the airline provides to cover her food expenses is included in the $400 listed for this item on her income and expense statement.

That said, we do not agree with Mr. Comninellis that no amount of maintenance was justified to cover Ms. Comninellis' reasonable needs. Mr. Comninellis argues that Ms. Comninellis "could save nearly $2,300 per month in expenses by spending less on her apartment, gifts, recreation and credit cards and "becoming more reasonable and limiting these expenses by half." He further declares that "[h]undreds of dollars could be saved" on food and clothing if Ms. Comninellis "assumed a reasonable lifestyle and not the extravagant one she lived when [Mr. Comninellis] was healthy and gainfully employed." He concludes that [m]erely taking a few reasonable steps could lower [Ms. Comninellis'] average monthly expenses ... by more than $3,000 per month."

The problem for Mr. Comninellis is that the trial court actually awarded Ms. Com-

ninellis over $3,000 less than the amount that she was requesting as maintenance. This suggests that the trial court took into account the excessiveness of some claimed expenses and determined the maintenance award accordingly. Absent specific findings of fact, we must presume that the trial court resolved all fact issues in accordance with the result reached. Rule 73.01(c).

**2. Sufficiency of the Property to Meet Reasonable Needs**

In its original decree, the trial court awarded Ms. Comninellis $32,932.13 in bank accounts; a Mercedes automobile valued at $20,000; an American Airlines 401k plan worth $735.76; the remains of the family home valued at $25,000; the fire insurance proceeds for the house totaling $223,000; and a $228,000 judgment against Mr. Comninellis. Following remand to resolve the issues addressed in *Comninellis I*, the trial court awarded the fire insurance proceeds and the remains of the family home to Mr. Comninellis.

It is difficult to ascertain whether the property ultimately awarded to Ms. Comninellis is sufficient to meet her reasonable needs because the trial court made no findings about this issue beyond its conclusion that she lacks sufficient property to meet her reasonable needs.

**3. Ms. Comninellis' Ability to Support Herself Through Appropriate Employment**

"Even if the spouse seeking maintenance once relied upon the other spouse for monetary support, he or she still has a duty to attempt to become self-sufficient through employment." *Ansley v. Ansley*, 15 S.W.3d 28, 32 (Mo.App. W.D. 2000). The employment should be appropriate to the skills and interests of the spouse seeking it. *Brueggemann*, 551 S.W.2d at 858.

Courts generally have awarded maintenance in situations where the party seeking it, has devoted a majority of her life to the household and maternal tasks, thereby, forfeiting the opportunity to develop occupational skills, or where the requesting party requires further education or training to support himself, i.e., rehabilitative maintenance. Justice does not require provision of support to a spouse who is or may be prepared to become self-supporting. Unemployment alone is not enough to require an award of maintenance. Mere inability to get a job is insufficient grounds for an award of maintenance.

*Kovacs v. Kovacs*, 869 S.W.2d 789, 793–94 (Mo.App. W.D.1994) (internal quotation marks and citations omitted).

Mr. Comninellis argues that Ms. Comninellis has not fulfilled her duty to seek appropriate employment because she has chosen to work a reduced schedule in her current job and because she has the ability to obtain a new, better-paying job as a professional counselor. Ms. Comninellis, on the other hand, argues that she cannot do better in her current job and that her low pay is directly attributable to the time that she spent out of the workforce at her husband's insistence.

Ms. Comninellis currently works as a flight attendant for American Airlines. According to her most recent income and expense statement, she grosses $2,692.20 and nets $1,599.40 every month from that job. Ms. Comninellis previously worked for Wang as a trained word-processing instructor. She also formerly worked for Trans World Airlines as a corporate spokesperson and as a flight attendant. When she went back to work for TWA as a flight attendant during the marriage in 1985, she was on the "A" pay scale—which was the highest pay scale—and enjoyed "very good" benefits. She testified that

Mr. Comninellis insisted that she quit that job, however, and told her that he would not "be married to a flight attendant." She agreed to quit the job in 1989 "so that I could work things out with him and stay home because my marriage, my home, and my family is of course my first commitment, my first priority."

In 1990, she returned to work as a flight attendant after Mr. Comninellis told her that he was going to "divorce [her] and teach [her] a lesson." This time, however, she went to work for American Airlines instead of TWA because she could make more money working for American. She explained that she gave up all of her seniority at TWA when she quit in 1989 and would have been on a lower pay scale if she had returned to TWA. When she started with American she was based out of Miami. She testified that Mr. Comninellis wanted her to be based there because his yacht was there and they spent so much time there.

She is now based in Chicago, which is closer to Kansas City, but which means, among other things, that she is also "further to the bottom as far as how much you're limited and restricted with your schedule" because Chicago is "a much more senior base." Her seniority is "much worse" at Chicago than at Miami. She testified that she has been working "full time" with American, although she occasionally drops a trip, which would make it a little less. She denied that a flight attendant working full time would make approximately $40,000 per year.

Ms. Comninellis also earned a master's degree in counseling psychology from the University of Missouri—Kansas City in 1997. According to a vocational expert who testified for Mr. Comninellis at the 2001 dissolution hearing, Ms. Comninellis could expect to earn $30,000 per year in that field during her first year and $40,000

per year after five years. But he further testified that her "best vocational opportunities are to remain in the job that she's had either with TWA or with American Airlines, and that's as a flight attendant." He estimated in 2001 that her earnings as a flight attendant "would be approximately $43,750.00 a year based on the new contract that I'm sure will be ratified by the members, based on my experience in dealing with labor relations issues at a large corporation."

Given the evidence before it, the trial court could have concluded that Ms. Comninellis is not able to support herself through appropriate employment. Although Mr. Comninellis argues that she has been "artificially reducing her income by attempting to maintain her home in Kansas City while being based outside the Kansas City area, asserting an inability to work full-time because of the extensive commuting necessitated by that arrangement," the record belies this argument. First, Ms. Comninellis is not "artificially reducing her income by attempting to maintain her home in Kansas City while being based outside the Kansas City area." The record shows that she lived in Kansas City throughout the marriage and that her family lives in Kansas City; there is nothing "artificial" about her decision to remain in Kansas City. Second, Ms. Comninellis testified that she was formerly based in Miami because Mr. Comninellis wanted it that way. And third, Ms. Comninellis currently is based in Chicago—not Miami—and is not "asserting an inability to work full-time" due to that arrangement; indeed, she testified at the 2003 hearing that she was working full-time.

■ Mr. Comninellis also points to the testimony of Kathleen Haydon, a co-worker of Ms. Comninellis. Ms. Haydon testified that she earns over $40,000 per year working a full-time schedule from week to week. Mr. Comninellis reasons that this evidence supports the conclusion that Ms. Comninellis likewise could earn that much if she worked full-time. This argument ignores Ms. Comninellis' testimony that she is working full-time and further ignores her testimony regarding her lack of seniority. After all, Ms. Comninellis contends that her lack of seniority is directly attributable to the time that she spent out of work at her husband's insistence. A spouse's withdrawal from the job market to be a homemaker is a sound basis for awarding maintenance. *See, e.g., Tate v. Tate,* 920 S.W.2d 98, 102 (Mo.App. E.D. 1996) ("The detrimental effect of wife's withdrawal from the job market to assume the duties of a homemaker was a sound basis for the court's award of maintenance.").

Moreover, Ms. Comninellis specifically denied that a flight attendant in her circumstance could earn $40,000 per year. The trial court was free to believe Ms. Comninellis' testimony. *See, e.g., Ritter,* 920 S.W.2d at 159 ("The trial court is free to believe all, part or none of any witness' testimony and is the sole judge of the credibility of the witnesses.").

Finally, Mr. Comninellis argues that "proper use" of Ms. Comninellis' master's degree "could provide her with an annual income of $30,000 to $40,000" and that "those figures were from back in 2001 and given the affects [sic] of inflation are slightly underestimated." But the record shows that Ms. Comninellis already earns close to $30,000 per year as a flight attendant and that she could not expect to earn $40,000 as a counselor for at least five years after starting a new career in that field. Furthermore, Mr. Comninellis' own expert testified that her "best vocational opportunities are to remain in the job that she's had either with TWA or with American Airlines, and that's as a flight attend-

ant." Although the expert further testified that he estimated her earnings "would be approximately $43,750.00 a year based on the new contract." the expert so testified in 2001, before the airline actually cut Ms. Comninellis' pay by 33.7%. Again, the trial court was free to believe Ms. Comninellis' testimony and to disregard the expert testimony to the contrary. *See, e.g., id.*

▮ Once Ms. Comninellis established the threshold requirements for maintenance, the trial court next had to determine the amount of maintenance to award by considering all relevant factors including:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

§ 452.335.2.

Mr. Comninellis focuses upon factors one, three, and eight. He argues that Ms. Comninellis received over $260,000 in the divorce and that this money is a significant income-producing asset that could be used to provide for Ms. Comninellis' reasonable needs. The trial court found that Ms. Comninellis lacks sufficient property, including marital property awarded to her by the court, to provide for her reasonable needs.

Based upon his conclusion that Ms. Comninellis can earn up to $40,000 per year and that he is incapable of employment due to his health, Mr. Comninellis reasons that the third factor favors him as well. This is not self-evident. As discussed already, the trial court could have accepted Ms. Comninellis' evidence that she is already earning as much as she is capable of earning. Furthermore, even though Mr. Comninellis may suffer from health problems that make him incapable of employment, this does not mean that he lacks income. Indeed, the record reveals that he still collects $3,000 per month in rent from his commercial property. He also receives an additional $1,399 per month in social security disability payments. Based solely upon the rental income, his comparative earning capacity is roughly equal to that of Ms. Comninellis: he grosses $3,000 per month in rental income, while she grosses $2,692.20 per month in wage income.

The trial court specifically found that factor eight favors Ms. Comninellis when it said:

The Court further finds that George is well able to provide for his own financial needs and to contribute to the financial support of Pamela. The court further

finds that while Pamela, in order to survive financially, has had to deplete the assets awarded to her in the Judgment of Dissolution, George has been able to live a comfortable lifestyle and has been able to pay his expenses without having to deplete his assets. Further, George has done this while paying to support two homes (one in Missouri and one in Florida) and while paying his attorney fees and other obligations as they become due. Pamela, on the other hand, has only one residence and, though she has depleted her assets and borrowed money in order to provide for herself financially, she has been unable to pay any of her attorney fees.

George has been able to pay all of these obligations, as they come due, without having to sell his yacht (which he intends to do) and without having to sell his real estate. Pamela, on the other hand, has had to deplete the bank and investment accounts awarded to her, has had to borrow $25,000 from her Mother, and has been unable to pay anything towards her $25,000 attorney fee obligation.

As the trial court found, Mr. Comninellis appears able to meet his own needs while meeting Ms. Comninellis' needs as well. According to the bond that Mr. Comninellis posted in connection with this case, his net worth exceeds $1,000,000. Shortly before the 2003 hearing, he had $343,000 in cash in one of his bank accounts. He had been able to pay several creditors tens of thousands of dollars [2] during the previous year. As Ms. Comninellis also points out, these expenses are not ongoing expenses because he will no longer pay attorneys' fees when this matter is concluded and because he testified that he is going to sell

his yacht, which will no longer require him to pay the expenses associated with that vessel.

The court also found that Mr. Comninellis was "not a credible witness, that he was deceptive and less than candid while testifying before [the] Court at the initial dissolution of marriage hearing and that his deception and lack of candor persisted through his testimony at the most recent hearing." The record supports this finding because Mr. Comninellis' explanations about where his money went are almost impenetrable. The trial court certainly could have disbelieved his assertions that he cannot meet his own needs, let alone those of Ms. Comninellis.

Although the parties do not meaningfully discuss the other factors, it is worth noting that factors four, six and seven also seem relevant here. By all accounts, the parties enjoyed a very high standard of living during the marriage. The marriage was a relatively long one, lasting nearly twenty years. And Ms. Comninellis is fifty-seven years old and testified that she has physical maladies that complicate her job as a flight attendant. These factors certainly could have influenced the court in determining the amount of maintenance in this case.

We cannot say that the trial court abused its discretion in awarding maintenance in the amount of $2,000 per month.

**B. The Trial Court Should Have Awarded Maintenance from the Date of the Original Dissolution Decree**

■ In its judgment awarding maintenance to Ms. Comninellis, the trial court determined that the maintenance award "should be made retroactive" but further determined that the court only had "au-

---

2. $2,798.51 to Jackson Marine; $15,813.20 to two attorneys; and $12,412.85 to his yacht club.

thority to make the award retroactive to the date of the mandate from the Court of Appeals (April 2, 2003)." Ms. Comninellis argues that the award should commence from the date of the original dissolution decree rather than the date of the appeals court's last mandate.

As interpreted by Missouri courts, section 452.335 only operates prospectively, not retrospectively. *Ritter,* 920 S.W.2d at 154–55 (dissolution decree issued on February 17, 1995, could not make maintenance award retroactive to January 1, 1994). The date from which it operates prospectively is not entirely clear, however. As this court's Southern District has observed:

> Whether the statute authorizes maintenance from the date of the dissolution hearing or the date of the decree has apparently not been directly addressed by Missouri appellate courts. A review of several dissolution cases suggests that most maintenance awards become effective on the date of the decree.

*In re Marriage of Hunt,* 933 S.W.2d 437, 447 (Mo.App. S.D.1996) (holding that permanent maintenance award should run from date of dissolution decree). *See also Anderson v. Anderson,* 55 S.W.3d 444, 445 (Mo.App. E.D.2001) ("Because Rule 84.14 gives our court the authority to enter such judgment as the trial court should have entered, we modify the maintenance award to begin as of the date of dissolution of marriage.").

The trial court entered its original decree of divorce and division of property on November 14, 2001. It did not award any maintenance in that decree. The trial court did, however, award maintenance in its October 15, 2003 judgment, following remand in *Comninellis I.*

Ms. Comninellis cites *Clarke v. Clarke* for the proposition that the maintenance award in this case should commence as of the date of the original decree. *See* 983 S.W.2d 192 (Mo.App. E.D.1998). The original judgment in *Clarke* was erroneous and the trial court ultimately issued a subsequent judgment reducing the amount of spousal maintenance, but failing to make the new amount effective as of the date of the original judgment. *Id.* at 193–94. This court's Eastern District reversed and held that the reduced maintenance award should be effective from the date of the original judgment because otherwise the husband would be denied "restitution for amounts that he paid as a direct result of an erroneous judgment." *Id.* at 194. Ms. Comninellis' case is somewhat different from *Clarke* in that the original judgment in her case did not award any maintenance, as opposed to too much maintenance. Moreover, *Clarke* is specifically grounded in principles of restitution.

But the broader reasoning articulated in *Clarke* applies here. If the trial court's original judgment in this case was erroneous because it failed to award any maintenance, then—just as in *Clarke*—it was erroneous when it was first issued, not when the trial court subsequently issued a second judgment correcting the first one. Had the trial court awarded maintenance in the original judgment, then Ms. Comninellis would have begun receiving maintenance from that time forward.

Ms. Comninellis also cites *N.M.O. v. D.P.O.,* in which the appeals court reversed an award of maintenance and remanded the matter so that the trial court could consider the income-producing potential of retirement and IRA accounts awarded to the wife. 117 S.W.3d 729, 730 (Mo.App. E.D.2003). Given this procedural posture, the appeals court determined that the husband could not be held in contempt for failing to pay maintenance since the husband was not presently obligated to pay. *Id.* But the court explained

that its decision "reversing and remanding the maintenance award leaves open the possibility that the trial court may still award substantial maintenance or even the same amount of maintenance, *retroactive to the date of the original award.*" *Id.* n. 2. (emphasis added). *See also In re Marriage of Myers,* 879 S.W.2d 736, 737 (Mo. App. S.D.1994) ("Where an appellate court increases maintenance it should be effective as of the date judgment was entered in the trial court."); *L.A.L. v. L.L.,* 904 S.W.2d 50, 55 (Mo.App. E.D.1995) ("Under Rule 84.14, the appellate court which believes the trial court has abused its discretion may enter the judgment the trial court should have entered, effective at the time of the decree.... The effective date of this judgment shall be ... the date of the decree from which this ·appeal was taken."); *In re Marriage of Torix,* 863 S.W.2d 935, 941 (Mo.App. S.D.1993) (same); *P.A.A. v. S.T.A.,* 592 S.W.2d 502, 505 (Mo.App. S.D.1979) ("That part of the trial court's judgment denying maintenance is reversed and the cause is remanded to the trial court with directions to enter judgment for maintenance in the amount of $400 per month, retroactive to December 15, 1976, which is the date of the original judgment of the trial court.").

Accordingly, the judgment of the trial court awarding maintenance from the date of this court's mandate is reversed. We need not remand this case, however, because we have the authority to "give such judgment as the court ought to give." Rule 84.14. We do so here and make the maintenance award effective from the date of the original dissolution decree.

## IV. CONCLUSION

The judgment of the trial court to award Ms. Comninellis $2,000 per month in maintenance was not an abuse of discretion and is, therefore, affirmed. But the award of maintenance will run prospectively from the date of the original dissolution decree, as opposed to the date of this court's last mandate.

HAROLD L. LOWENSTEIN and RONALD R. HOLLIGER, JJ. concur.