WILLIAM BLACK *et al.*, Plaintiffs-Appellees, v. ALBERT IOVINO, Defendant-Appellant.

First District (6th Division) No. 1—89—2855

Opinion filed February 15, 1991.—Rehearing denied October 22, 1991.

Patrick S. Moore, of Chicago, for appellant.

Lehrer, Flaherty & Canavan, P.C., of Wheaton (Maureen Flaherty, of counsel), for appellees.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Following a bench trial, the trial court found that defendant had committed common law fraud and violations of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1983, ch. 121½, par. 262) (Consumer Fraud Act). Plaintiffs were awarded actual and punitive damages, costs and attorney fees.

The issues raised by defendant on appeal are: (1) whether the trial court erred in admitting documents and testimony regarding loans for the purchase of other vehicles; (2) whether the trial court erred in admitting the testimony of plaintiffs' purported expert witness; (3) whether the trial court erred in finding that defendant was liable for common law and statutory fraud; (4) whether the trial court erred in assessing compensatory damages in the amount of $3,000; and (5) whether the punitive damage award of $20,000 was improper. Plaintiffs have filed a cross-appeal raising the issue of whether the trial court abused its discretion in arbitrarily reducing the amount of attorney fees.

On February 20, 1983, the plaintiff William Black saw an advertisement in the Chicago Tribune for the sale of a 1980 Cadillac Sedan deVille placed by the defendant Albert Iovino. William and Charlene Black observed the car that day, and they agreed to purchase the vehicle for $9,350. The sale was completed on March 1, 1983. On September 13, 1983, plaintiffs filed a complaint against defendant alleging that he knowingly misrepresented the prior ownership of the vehicle as well as its "salvage vehicle" status, and that this conduct consisted of fraud. Approximately four years later, plaintiffs amended their complaint to include a second count alleging that the transaction at issue was a violation of the Consumer Fraud Act.

At the trial, which commenced on July 12, 1989, William Black testified that when he first spoke with defendant by telephone, defendant stated that the vehicle had only been driven for 20,000 miles and that it was very clean. Plaintiffs went to defendant's house and saw the vehicle under artificial light. William Black noted that both the exterior and interior of the vehicle were very clean, and he asked defendant if the car had come from a dealer. According to Wil-

liam Black's testimony, defendant replied that he acquired the car from his father-in-law's estate rather than from a dealer. When Black asked defendant about a missing owner's manual and why there were no grease stickers on the door, defendant stated that the owner's manual was probably with the estate papers. Defendant had no explanation for the absence of grease stickers on the door, but he stated that the car had been serviced regularly.

The next day William Black telephoned defendant and informed him that he could obtain the money for the purchase of the vehicle and close on the transaction the following day. Defendant then stated that he would get the title to the vehicle, but, he telephoned Black a short time later and told him that the title had never been transferred to him. Black also testified that defendant refused any assistance that Black offered to expedite the transfer of the title to defendant. Black then telephoned the bank that was allegedly in possession of the vehicle title, to verify its existence. According to Black's testimony, he was informed by one of the bank employees that the vehicle at issue had been purchased by defendant from an automobile dealership. Black then telephoned defendant and told him about his conversation with the bank employee. Defendant denied that the car had been purchased from a dealership. Black testified that, at that point, he still accepted defendant's statement that the vehicle was from his father-in-law's estate. Black stated that he again telephoned defendant that evening and questioned him about the origin of the vehicle. In response to Black's inquiry, defendant stated that the mileage reading of 20,000 on the odometer was accurate, that the car was from his father-in-law's estate and that his father-in-law had owned the car for several years. Defendant also stated that, to his knowledge, his father-in-law had never had an accident with the vehicle which required repair, and the vehicle had never been "cleaned up" by a dealership. Black testified that he believed defendant's statements and relied on them to proceed with the transaction.

On March 1, 1983, Black met defendant at the bank. Black gave defendant a check for the agreed sale price, and defendant gave Black the certificate of title. Black inspected the title and noted that it contained the initials "SV," but testified that he thought the initials stood for Sedan deVille. Black sent the requisite documents to the Secretary of State to obtain title to the vehicle. Shortly thereafter, he received a correspondence from the Secretary of State's office informing him that the car was a salvage vehicle, which was indicated as SV on the title. Black then obtained a certified copy of the chain of title to the vehicle which indicated that the original owner of the vehicle

was an automobile dealer by the name of LeRoy Lewis. The car had been stolen from Lewis, and when it was found, it was declared a total loss and titled to the insurance company, which sold the vehicle to Nicole Motors. Defendant received title to the vehicle from Nicole Motors on February 24, 1983.

When Black discovered that the car he had purchased was a salvage vehicle, he made a second inspection of it and found the following alterations: (1) the vinyl top and interior had been dyed tan; (2) the trim, which should have been painted, consisted of plastic strips; (3) the left front fender had been repainted; (4) the interior head liner had several wrinkles; (5) the rear seat was not bolted down; and (6) the trunk lock had been repaired. Black also testified to several other cosmetic alterations in the interior of the vehicle.

Defendant testified as an adverse witness that he purchased the vehicle at issue from Nicole Motors in November 1982. He also stated that the car was in the same condition when it was sold to Black as when he had purchased it. Defendant could not recall how many miles the car had been driven during the time he owned it but estimated that it was approximately 2,000 miles. He did not apply for a certificate of title and could not recall if one was issued in his name before he sold the vehicle to Black. Defendant testified that he told Black that he had obtained the vehicle in question from a dealer and denied telling him that it was from his father-in-law's estate. Defendant also denied any knowledge that the car had been totally rebuilt. Defendant was then shown documents containing the title history of the vehicle. One of these documents contained the signature of defendant with the letters SV next to the signature. Defendant initially stated that the signature looked like his signature, but then claimed that he had never seen the document and did not sign it.

Carl Wascher testified that he was a loan officer for the Villa Park Trust and Savings Bank. As a loan officer, his responsibilities included approving and executing consumer, automobile and home improvement loans as well as some commercial loans. During the past several years he primarily dealt with automobile loans. In this capacity, he became familiar with automobile values and what the bank would approve as a loan. He also stated that the bank valued automobiles by means of a used car evaluation book known as the "Redbook." The court accepted Wascher's qualifications to testify as an expert. Wascher then testified that he used the Redbook as a reference to determine the value of the vehicle at issue and verified with the publisher that the amount listed was the correct figure at the time the vehicle was purchased. He testified that a 1980 Cadillac Se-

dan deVille in January 1983 was worth $9,900. Wascher further testified that a salvage vehicle was one which was damaged to such an extent that the amount of damage exceeded the value of the vehicle. Its value was then greatly reduced because a bank would not put a lien on the vehicle as it could not be used as collateral. This factor also made resale of the vehicle difficult. Wascher further testified that he considered the mileage as well as the condition of the vehicle in determining its value. He stated that the vehicle at issue had very little or no value because of the SV designation. He also added that even if a bank were to put a lien on a vehicle with an SV designation, its value would still be diminished.

Charlene Black testified that she was with her husband when they first saw the car at defendant's home. When she asked defendant why he was selling the car, he replied that it had belonged to his father-in-law but that his father-in-law had died.

Defense counsel had subpoenaed plaintiff's brother, Robert Black, as his first witness, but when Robert Black failed to appear counsel for both parties agreed to the admission of Robert Black's deposition testimony into evidence. At the time of his deposition, Robert Black had been the owner of an "Auto body rebuilding" shop in Geneva, Illinois, for six years. He had been in the auto rebuilding business for 41 years and had owned his own business for 17 years. As part of his business, he prepared repair estimates and appraised vehicles. He had also had business transactions with numerous major insurance companies, such as State Farm and Allstate. Robert Black stated that he had inspected the vehicle at issue approximately 1½ to 2 years earlier. As part of his inspection of the vehicle, he placed it on a rack to inspect the underside. He found that the step plates had been removed and that the top of the rocker panel had been cut in order to push out a dent on either side of the vehicle. He also testified to the various cosmetic changes in the interior of the vehicle which were described in William Black's testimony. Robert Black stated that he had cautioned his brother against purchasing a vehicle with an SV designation on the title six months before the vehicle at issue was purchased. He then stated that an SV designation on a title reduced the value of the vehicle by about $2,000. Robert Black contacted Richard's Buick in St. Charles and was informed that the vehicle at issue was worth $6,000 at that time.

Klemens Brszkiewicz testified for the defense that he was an independent insurance adjuster/appraiser. He was initially involved in the automotive repair trade and then became an insurance appraiser, which he has been for about 24 years. Brszkiewicz stated that he re-

ceived on-the-job training and attended trade schools and technical institutes. He testified that he was self-employed and was the owner and operator of Suburban Appraisal. Brszkiewicz was familiar with the SV designation and its effect on the value of automobiles. He stated that he determined the value of a vehicle by reference to the "National Automotive Dealers Appraisers" and the Redbook. Brszkiewicz further stated that he did not see the vehicle title when he was determining its value. He testified that a salvage vehicle could only be sold to a licensed rebuilder to be put in serviceable condition. The vehicle would then be inspected by the Secretary of State. The purpose of the SV designation was to prevent the rebuilding of vehicles with stolen parts. Brszkiewicz also stated that the value of the vehicle would be affected if it was not properly repaired, but that, in his opinion, the SV designation had no affect on its value in the insurance industry. If a salvage vehicle was rebuilt, its value could not be determined until it was inspected. Brszkiewicz stated that a title with a SV designation was a lienable title but added that he had never worked as a loan officer for a bank.

Following closing argument, the case was taken under advisement. Judgment was subsequently entered against defendant, and plaintiffs were awarded $3,000 in actual damages and $20,000 in punitive damages. Plaintiffs' counsel petitioned the court for attorney fees and costs, and defense counsel filed a response. The trial court reduced the hourly rate requested by plaintiffs' counsel but approved the hours sought. The amounts awarded were $17,785 in attorney fees and $1,244.81 in costs. Defendant subsequently appealed and plaintiffs cross-appealed the trial court's reduction in the amount of attorney fees.

In their brief, plaintiffs preface their reply to defendant's arguments by claiming that a number of issues raised by defendant should be stricken because there is no citation to authority. Because we conclude that several of the 14 issues listed are repetitious, we have combined some of them and reduced the number to five issues. There are now cases cited for each of the issues, and none of the issues are stricken.

■ Defendant has also prefaced his argument in his reply brief with a motion to strike the plaintiffs' statement of facts, arguing that it contains inaccurate or false statements. Both parties' statements of fact contain excerpts from trial testimony which were contradictory. On review, this court disregards inappropriate statements contained in either brief. Therefore, striking plaintiffs' statement of facts is un-

warranted. *James v. Yasunaga* (1987), 157 Ill. App. 3d 450, 452, 510 N.E.2d 531.

 Defendant first contends that the trial court erred in admitting evidence of loans for the purchase of other vehicles because the evidence was prejudicial, irrelevant and in violation of a pretrial discovery order. The documents to which defendant refers were four loans which he obtained to purchase used cars from Nicole Motors between December 1981 and March 1983. At the trial, these documents, which were identified as plaintiffs' exhibits 10 through 13, showed that defendant purchased and sold four used vehicles within a 15-month period, and that two of the vehicles were salvage vehicles. Contrary to defendant's contention, the documents were relevant to plaintiffs' allegations that defendant knowingly misrepresented the prior owner(s) of the subject vehicle as well as its salvage vehicle status, both of which constituted fraud. The documents were also relevant to show that defendant was more actively involved in the purchase and sale of vehicles than a private party involved in an isolated transaction. This is evidence which could bring defendant's conduct under the regulation of the Consumer Fraud Act.

 Defendant further argues that the admission of the documents was error because plaintiffs failed to reveal the source of the documents, and they were apparently obtained in violation of a prior discovery order of the court. Prior to the trial, plaintiffs had subpoenaed Mid America Federal Savings & Loan, Nicole Motors and the Secretary of State for documents regarding any transactions with defendant. The motion to quash plaintiffs' subpoena for records from Mid America Federal Savings Bank was granted without prejudice to plaintiffs' filing a more limited request. The motion to quash the subpoena for records from Nicole Motors was denied, and the subpoena was amended so that Nicole Motors was only required to produce documents regarding the sale of vehicles to defendant during the period between February 20, 1982, and February 20, 1983. A third motion by defendant to quash a subpoena for records from the Secretary of State was also denied, and the subpoena was amended to only require the production of material related to defendant individually and in conjunction with Nicole Motors. Although plaintiffs claimed that the documents were obtained from the Secretary of State, defendant argued at the trial and now on appeal that the documents were obtained from Mid America Federal Savings & Loan in violation of the court's pretrial discovery order. Because the source of the documents was a factual question for the trial court to determine, and defendant asserted his allegation without any supporting evidence, the trial court's

finding that the admission of the documents did not violate a prior court order was proper. *Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 197, 538 N.E.2d 530.

■ Defendant argues that the documents were improperly admitted as substantive evidence because they were purportedly offered for impeachment, and a timely objection to the admission of the documents was made by defense counsel at the trial. However, it was the trial court which determined that the documents were admissible as substantive evidence of "knowledge and fraud." Furthermore, although defense counsel did object to the admission of the documents at the trial, the arguments he advanced, both at the trial and in his brief, were based on relevancy and the pretrial discovery order. We have previously addressed both arguments and have found that neither one supports defendant's position that admission of the documents was improper. We also find that defendant's remaining arguments relative to this issue have no merit.

For the above reasons, we conclude that the admission of the documents and testimony regarding loans for the purchase of other vehicles by defendant was proper.

■ Defendant next contends that the admission of the testimony of plaintiffs' purported expert was error because plaintiffs' counsel failed to establish adequate credentials for the witness to testify as an expert on the value of the subject vehicle. Whether a witness qualifies as an expert is within the sound discretion of the trial court. *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257; *First National Bank v. Village of Mount Prospect* (1990), 197 Ill. App. 3d 855, 863, 557 N.E.2d 1257.

In this case, plaintiffs offered the testimony of Carl Wascher, who testified that he had a bachelor of science degree in business administration and a similar degree in systems management. He was employed as a loan officer at the Villa Park Trust and Savings Bank. He testified that he was responsible for the approval of various consumer, home improvement, commercial and automobile loans, and that for the past three years he primarily arranged automobile loans. Wascher also stated that the Redbook was used by the bank as an authority in determining the value of an automobile, and that other factors such as the mileage and general condition of the vehicle were also factors which were considered. The trial court accepted Wascher's qualifications to testify as an expert in the valuation of used cars. Wascher then testified that the subject vehicle was worth $9,900 in 1983, without the SV designation, but that with the designation, the vehicle had almost no value.

■■ Defendant claims that Wascher had no education, training or specialized knowledge regarding the valuation of automobiles beyond that of the average person. Although defendant relies on *Buechin v. Ogden Chrysler-Plymouth, Inc.* (1987), 159 Ill. App. 3d 237, 511 N.E.2d 1330, in support of his argument, the trial court in that case found that the witness did not qualify as an expert, as opposed to this case, where the witness was found to be qualified.

Defendant also argues that the testimony of Wascher was contradictory and unbelievable. Wascher testified that a vehicle with an SV designation was reduced in value because a bank would not issue a loan if the designation was on the title. However, even if we were to agree that the record does not support why a three-year-old Sedan deVille in excellent condition is without value, the result in this case would not change. Robert Black had previously testified that he had extensive experience in the automobile rebuilding business over a period of 41 years. He stated that a salvage vehicle designation reduced the value of the vehicle by approximately $2,000. To verify the value of the vehicle, Robert Black contacted a dealership. The used car manager informed Black that with the SV designation, the vehicle was worth $ 6,000. The fact that the trial judge awarded plaintiffs compensatory damages of $3,000 rather than the total amount that they had paid for the vehicle, as suggested by Wascher, indicates that he considered other competent evidence along with Robert Black's testimony in determining plaintiffs' damages.

■■ Defendant next contends that the trial court erred in finding that he was liable for common law and statutory fraud. The elements of a cause of action for common law fraud are: (1) a false statement of a material fact; (2) known or believed to be false by the party making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party as a result of the reliance. Reliance by the other party must also be justified. (*Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599.) The concealment of a fact amounts to a misrepresentation only if it was done with the intent to deceive under circumstances where there was opportunity and a duty to speak and the other party would have acted differently if the fact had not been concealed. (*Huls v. Clifton, Gunderson & Co.* (1989), 179 Ill. App. 3d 904, 909, 535 N.E.2d 72; *Lindsey v. Edgar* (1984), 129 Ill. App. 3d 718, 723, 473 N.E.2d 92.) Whether a party has adequately proved the elements of fraud is a question of fact, and a reviewing court will not disturb a trial court's finding of fraud unless it is against the manifest weight of the evidence. *Crowder v. Bob Oberling*

*Enterprises, Inc.* (1986), 148 Ill. App. 3d 313, 315, 499 N.E.2d 115; *Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 359, 491 N.E.2d 1236.

In count I of their amended complaint, plaintiffs alleged that defendant knowingly misrepresented the prior ownership of the vehicle, failed to disclose its salvage vehicle status, and that these misrepresentations and omissions were part of a plan or scheme to induce plaintiffs to rely on them in purchasing the car. Plaintiffs further alleged that they reasonably relied on defendant's statements and that they were material to plaintiffs' decision to purchase the vehicle. Finally, plaintiffs alleged that they were damaged in their ability to sell the vehicle as a result of defendant's misrepresentations and omissions.

William Black testified at the trial that prior to the purchase of the vehicle, defendant told plaintiffs that the vehicle had belonged to defendant's father-in-law, who had recently died, he had owned the vehicle for several years, the vehicle had never been in an accident while it was in the father-in-law's or defendant's possession and it had not come from a dealership. Black also testified that after he purchased the vehicle, he received a document informing him that the vehicle was a salvage vehicle. Although defendant denied any knowledge of the salvage vehicle status, the evidence established that defendant had signed a document which indicated that the vehicle was a salvage vehicle. The evidence also established that defendant had purchased the vehicle from the dealership after it had been rebuilt. In addition, evidence was presented regarding the reduction in value of the vehicle due to its salvage vehicle status.

Defendant cites *Parsons* (142 Ill. App. 3d 354) in support of his argument that plaintiffs failed to establish clear and convincing evidence of a knowing misstatement or omission of material fact on the part of defendant. Defendant claims that assuming that he made the misrepresentation that the vehicle came from his father-in-law's estate, and he did not disclose that it came from a dealer, this misstatement and omission was not actionable. Defendant reasons that the statement regarding the source of the vehicle was only an expression of opinion as to the value of the property which could not be the basis for a claim of fraud. However, defendant's statements that the vehicle was from his father-in-law's estate and not from a dealership was clearly a misstatement of fact rather than an opinion of the vehicle's value, unlike the statement of a real estate broker regarding the market value of property in *Duhl v. Nash Realty, Inc.* (1981), 102 Ill. App. 3d 483, 429 N.E.2d 1267, which is cited by defendant.

Defendant also claims that the statements regarding the source of the vehicle were not material because whether the vehicle was from his father-in-law's estate or the dealership did not affect its value. Defendant is partially correct in stating that it was the SV designation on the title that affected the value of the vehicle. However, what also affected the value was the fact that the vehicle had been stolen, damaged beyond repair and subsequently rebuilt. There was evidence from the deposition testimony of Robert Black as to the structural and cosmetic defects, and the fact that the rebuilt product was not of the same quality as a vehicle of that year which had not gone through this process. The fact that William Black stated that he asked defendant several times whether the vehicle had come from his father-in-law's estate and if it had been in an accident is evidence that he might have taken other action if he had known of the true origin of the vehicle.

Defendant also claims that his failure to disclose the SV designation on the title was not a material omission because he was not aware that it was on the title or what it meant. The court in *Crowder* (148 Ill. App. 3d at 317) held that failure to disclose the salvage designation of a vehicle was an omission of a material fact. Although defendant claims that this case is distinguishable from *Crowder*, because he had no knowledge of the SV designation, the trial court did not find that this representation by defendant was credible. The evidence which supported the trial court's finding that defendant did have knowledge of the SV status of the vehicle consisted of the document in the title history which contained defendant's signature and the enlarged letters SV as well as the documents pertaining to defendant's purchase and sale of another salvage vehicle. Based on this evidence as well as the trial court's observation of defendant's demeanor as he testified, we conclude that the trial court's finding that he had knowledge of the SV designation on the vehicle title was proper.

Defendant next argues that plaintiffs failed to prove that they justifiably relied on the material misstatements and omissions. In support of this argument, defendant states that the plaintiffs' reliance on the misstatements and omissions was not reasonable because they had ample opportunity to discover the true facts about the vehicle's status by checking public records, requesting more information about defendant's father-in-law's estate and conducting a closer inspection of the vehicle before purchasing it. While this may have been true, the trial court found that the source of the subject vehicle had been misrepresented. We conclude that where plaintiffs believed that the

vehicle had been owned by defendant's father-in-law for several years, they were not alerted to inquire further. See *Marino v. United Bank of Illinois, N.A.* (1985), 137 Ill. App. 3d 523, 527, 484 N.E.2d 935.

Defendant also argues that the sale of the vehicle to plaintiffs was an isolated sale by a private party and therefore not subject to the provisions of the Consumer Fraud Act. As we concluded above, the fact that defendant purchased and sold four used cars within a 15-month period, two of them being salvage vehicles, supports the conclusion that his commercial activities were more than an isolated transaction by a private party. (See *People ex rel. Scott v. Larance* (1982), 105 Ill. App. 3d 171, 174, 434 N.E.2d 5.) Therefore these activities were subject to the provisions of the Consumer Fraud Act.

Accordingly, we conclude that the trial court properly found that defendant was liable for both common law and statutory fraud.

Defendant next contends that the compensatory damage award of $3,000 was improper because plaintiffs failed to offer any admissible evidence regarding the reduced value of the vehicle as a result of the salvage vehicle designation. There was no dispute as to the value of the subject vehicle if it were not a salvage vehicle. At the time plaintiffs purchased it, it was valued at approximately $9,000. Although defendant argues that its value was not reduced because the vehicle was rebuilt, Robert Black stated that the SV designation did reduce the value of a vehicle, and that the vehicle purchased by the plaintiffs was worth $3,000 less than what they had paid for it. Robert Black testified to this amount after conferring with a dealership. Furthermore, Robert Black as well as both parties' experts testified that the mileage and condition of the vehicle after it was rebuilt also affected its value. He cited numerous structural and cosmetic defects in the Cadillac after it was rebuilt. Although plaintiffs could have discovered these defects, they were not alerted to the need to have the vehicle so thoroughly inspected when they were led to believe that it had come from the father-in-law's estate as opposed to a dealer and were not informed that it was a salvage vehicle. In making a determination of damages, "[a]bsolute certainty is not required, and all that the law requires is that there be an adequate basis in the record for the court's determination." (*First National Bank & Trust Co. v. J.P. Schermerhorn & Co.* (1989), 192 Ill. App. 3d 1057, 1062, 549 N.E.2d 862.) In this case, we conclude that there was sufficient evidence in the record to support the trial judge's determination regarding the compensatory damage award.

■■ ■ Next, defendant argues that the imposition of punitive damages was improper and even if proper an award of $20,000 is excessive.

The initial question is whether the facts and circumstances of this case justify the imposition of punitive damages; this is a question of law. (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 211, 454 N.E.2d 210.) In determining entitlement, each case must be considered in its own context. (*Kleidon v. Rizza Chevrolet, Inc.* (1988), 173 Ill. App. 3d 116, 121, 527 N.E.2d 374.) Defendant does not, nor can he, dispute that punitive damages may properly be awarded in an action for fraud. (See *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 579, 491 N.E.2d 464.) Rather, he argues that his conduct was not gross or malicious fraud and that there was no pattern of bad faith. The facts here show that the trial judge properly found that defendant's conduct was fraudulent and violative of both the common law and the Consumer Fraud Act. Once such a finding is made, the question of whether to impose punitive damages rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Warren*, 142 Ill. App. 3d at 580.

■■ Defendant has not cited any cases which prohibit the imposition of punitive damages to a factual scenario such as this. Further, defendant's argument which attempts to minimize the enormity of the wrong is more properly considered in the context of whether the punitive award is excessive. For these reasons, we do not agree that the trial judge's decision to impose punitive damages was an abuse of discretion.

■■ ■ While we disagree that the imposition of punitive damages was an abuse of discretion, we agree that the award of $20,000 was clearly excessive. Punitive damages are intended to punish and deter. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 187-88, 384 N.E.2d 353.) Because they are penal in nature, they are not favored, and courts must be cautious to see that they are not improperly or unwisely awarded. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 203, 537 N.E.2d 267.) While not exhaustive, relevant circumstances in reviewing an award of punitive damages include the nature and the enormity of the wrong, the financial status of the defendant and the potential liability of the defendant. (*Jines v. Seiber* (1990), 193 Ill. App. 3d 390, 394, 549 N.E.2d 964.) Each case must be carefully examined in light of the specific facts involved, and the ultimate determination should be governed by the circumstances of each individual case. *Deal*, 127 Ill. 2d at 204.

■■ ■ We first consider the nature and enormity of the wrong. While defendant's statements were false and intentional, they all were in relation to the history of the subject vehicle. Defendant claims that the facts here are a variation of "this car was owned by a little old lady who only drove it on Sundays." While we do not agree with this analogy, we do see some similarities. In a fraud action, all statements which would give rise to a punitive damage award must of necessity be false and intentionally made. Some, however, "are clearly more reprehensible than others. The egregiousness of the act should be reflected in the amount of the award." (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 712, 450 N.E.2d 1199.) The court further noted:

> "Recognizing that punitive damages are in the nature of a criminal sanction, we are simply saying that the punishment should fit the crime. An award which is disproportionate to the wrong serves none of the purposes of punitive damages and is excessive." (*Hazelwood,* 114 Ill. App. 3d at 713.)

While we in no way condone defendant's conduct, the award of $20,000 in this case was clearly disproportionate to both the nature and the enormity of the wrong.

■■ Even more important to our decision is the second factor, the financial status of the defendant. Because punishment and deterrence are the only justifications for punitive damages, it follows that the defendant's financial situation is relevant. An amount sufficient to punish or to deter one individual may be trivial to another. As a result, if one's financial status is not considered, the very reason for the imposition of punitive damages could be subverted. "Simply stated, the amount of the award should send a message loud enough to be heard but not so loud as to deafen the listener. A deafening award is excessive." *Hazelwood,* 114 Ill. App. 3d at 713.

■■ In this case, the record does not contain any relevant evidence with respect to defendant's financial status. Plaintiff argues that a defendant is only permitted to introduce evidence of his financial status by way of rebuttal. We agree. It is plaintiff's decision to interject evidence of defendant's financial condition. If he does, the defendant may counter it. However, if plaintiff fails to introduce such evidence, the defendant is prohibited from doing so. See *Wilson v. Colston* (1983), 120 Ill. App. 3d 150, 152, 457 N.E.2d 1042.

This rule has its origin in *Mullin v. Spangenberg* (1884), 112 Ill. 140. There, the court stated:

> "Where a plaintiff entitled to vindictive damages offers no evidence of the defendant's wealth with a view of enhancing

them, he in effect says, 'I ask no damages against the defendant except as a mere individual, *without any regard to his property or estate, whether it be much or little,'—and in that kind of a case the jury have no right to give any more damages than they would if it had affirmatively appeared the defendant was without pecuniary resources.* [Emphasis added.] But where the testimony is offered by the plaintiff, he does it for the purpose of enhancing the damages. By offering it he in effect says, 'I ask in the way of damages something more than I would be entitled to recover from the defendant as a mere individual, without regard to his pecuniary circumstances.' In doing this, the plaintiff tenders a new issue of fact, which opens up the question to both sides." *Mullin*, 112 Ill. at 145-46.

In other words, a plaintiff cannot have it both ways. While he may choose to not introduce any evidence of defendant's financial status, his doing so will limit his recovery of punitive damages to an amount sufficient to punish or deter a man who is without pecuniary resources. It should further be noted that while punitive awards were affirmed in *Wilson* and *Mullin*, neither defendant in those cases challenged the amount of the award.

 The judgment in this case included $3,000 in compensatory damages, $17,785 in attorney fees and $1,244.81 in costs. This is not an unsubstantial amount of money. Because the record is devoid of any evidence of defendant's financial status, any punitive damage award would be limited to a situation where the defendant is without pecuniary resources.

In light of the foregoing, we conclude that the amount of punitive damages awarded to the plaintiffs should be reduced to $1,000.

## CROSS-APPEAL

Plaintiffs contend that the trial court abused its discretion in arbitrarily reducing the amount of fees awarded to plaintiffs' attorneys because the reduction in fees was contrary to the evidence submitted in support of the petition. Along with their petition for fees and costs, plaintiffs submitted affidavits supporting their petition as well as documents of the hours worked, the work performed, the expertise of the attorneys and their hourly rate for in-court and out-of-court time. Plaintiffs' petition requested fees based on an hourly rate of $150 for in-court time and $125 for out-of-court time. The trial court granted fees and costs but reduced the hourly fee awarded to $125 for in-court time and $85 for out-of-court time.

 While it is necessary for a party seeking attorney fees to provide evidence regarding the number of hours expended and the hourly rate, the trial judge is not bound by the petitioning attorney's opinion of what constituted a reasonable fee and may use his own knowledge and experience to make a determination. (*In re Estate of Healy* (1985), 137 Ill. App. 3d 406, 411, 484 N.E.2d 890.) A reasonable fee in any given case is determined by the weight of the evidence. (*Healy*, 137 Ill. App. 3d at 411.) Factors considered in determining the amount of fees are the skill and standing of the attorney, the nature of the case, the novelty and difficulty of the question at issue, the amount and importance of the subject matter, the degree of responsibility, the usual and customary charges and the benefits to the client. (*In re Marriage of Armstrong* (1982), 107 Ill. App. 3d 217, 219, 437 N.E.2d 761.) In view of these factors, we cannot say that the trial judge abused his discretion in reducing the hourly rate of the attorney fees award.

Accordingly, the judgment of the circuit court awarding plaintiffs compensatory damages and attorney fees is affirmed. On plaintiffs' cross-appeal, the judgment reducing the amount of the attorney fees award is also affirmed. However, the judgment for $20,000 in punitive damages is vacated, and the cause is remanded with instructions that the court enter a punitive damage award in the amount of $1,000.

Affirmed in part, vacated and remanded in part.

McNAMARA and EGAN, JJ., concur.