# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 00-6068EM

_____

In re:

Donald Nangle

    Debtor.

Patricia A. Siemer,

    Plaintiff-Appellee,

        v.

Donald Nangle

    Defendant-Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*   Appeal from the United States
\*   Bankruptcy Court for the
\*   Eastern District of Missouri
\*
\*
\*
\*

_____

Submitted: November 8, 2000
Filed: January 4, 2001

_____

Before KOGER, Chief Judge, KRESSEL and DREHER, Bankruptcy Judges.

_____

KRESSEL, Bankruptcy Judge.

      The debtor, Donald Nangle, filed a petition under Chapter 7 of the Bankruptcy Code on February 17, 2000. On March 31, 2000, Patricia Siemer commenced an adversary proceeding against Nangle, pursuant to 11 U.S.C. § 523(a)(6) and (a)(7), asking that Nangle's debts to her be determined to be

nondischargeable. On June 16, 2000, the bankruptcy court entered an order granting Siemer's motion for summary judgment, determining that the debts owed her were nondischargeable under 11 U.S.C. § 523(a)(6).[1]   Nangle appeals from this order. We affirm in part, and reverse and remand in part.

BACKGROUND

A.  The Illinois Judgment

Siemer filed a complaint against Nangle in Illinois state court on September 10, 1990, seeking damages pursuant to the federal Fair Debt Collection Practices Act.[2]  On October 25, 1991, she filed an amended complaint asserting two causes of action. Count I of the amended complaint sought actual damages in the amount of $1,000 for each of Nangle's alleged violations of the Fair Debt Collection Practices Act, in a total amount exceeding $15,000. Count II sought compensatory and punitive damages for Nangle's alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.[3]  Both counts asserted that Nangle intentionally engaged in various activities which harassed, oppressed and abused Siemer in order to collect a consumer debt from her.[4]

Following a jury trial and based upon the jury's verdict, the Illinois court entered judgment in favor of Siemer in the amount of $42,841.69. The Illinois Judgment, which was entered on or about July 15, 1992, included actual damages, attorneys fees and costs, and punitive damages of $20,000. Nangle appealed the judgment to the Appellate Court of Illinois, which court issued an order to show cause why Nangle's petition for leave to appeal should not be stricken for lack of jurisdiction. Nangle did not respond to the appellate court's order to show cause, and the appeal was thus stricken on or about December 8, 1994. Nangle took no further steps to contest the Illinois Judgment, which is now final.

---

[1]  Because it was not necessary, the bankruptcy court did not address the § 523(a)(7) claim.

[2]  15 U.S.C. § 1692, *et. seq.*

[3]  Ill. Rev. Stat., Ch. 121 ½ (current version at 815 Ill. Comp. Stat. 505/2 (1993)).

[4]  The complaint asserted, among other things, that Nangle:  used profane language; contacted her by telephone late at night; repeatedly telephoned her; contacted her knowing she was represented by counsel; used false, misleading and deceptive representations regarding the amount and status of the debt; accused Siemer of committing criminal offenses; and attempted to collect amounts not owed.

On February 25, 1994, Siemer registered the Illinois Judgment as a foreign judgment in the Circuit Court of the County of St. Louis, Missouri. The judgment was "revived" on April 20, 1998. Nangle has never made any payments to Siemer on the judgment. Nangle estimates that, with interest, the unpaid Illinois Judgment has now increased to approximately $72,500.

B. The Contempt Order

In Missouri Siemer attempted, through numerous avenues, to discover Nangle's assets for purposes of collection of the judgment. Nangle responded with attempts to stymie such efforts. Siemer noticed Nangle's deposition for October 29, 1999. The deposition notice included a demand to produce documents concerning Nangle's assets. Nangle failed to produce all the documents required, and further refused to respond to certain deposition questions regarding his assets. The Missouri state court entered an order, on January 4, 2000, granting Siemer's motion to compel and ordering Nangle to produce the withheld information within 10 days.

Rather than complying, Nangle moved, by motion mailed 2 days before his production was due, for a continuance and stay of the order to produce. The motion asserted that: (1) Nangle needed 30 days to comply, and (2) Nangle was "seriously exploring the viability of filing a Chapter 7 Bankruptcy proceeding [sic] as an alternative to subjecting himself to this creditors [sic] proceeding." The court did not grant Nangle's motion. Nangle did not comply with the court's order, and Siemer brought a motion for contempt.

Nangle failed to appear at the hearing on Siemer's contempt motion, and the court entered an order, on February 17, 2000, granting Siemer's motion and holding Nangle in contempt of court for failure to comply with the order to produce. The Contempt Order imposed a "compensatory fine" against Nangle in the amount of $40,723.32, plus interest at 9 percent per annum from July 16, 1992, until paid in full.[5] The order provided that Nangle could "purge" his contempt by paying the fine, and that enforcement of the order was stayed until February 24, 2000 to allow Nangle an opportunity to "purge" his contempt.[6]

---

[5] Although the Contempt Order is silent regarding whether the fine is payable to the court or to Siemer, the parties herein have assumed that it is payable to Siemer.

[6] This was not Nangle's first contempt order in connection with this matter. In an order dated November 21, 1994, the Illinois state court issued an order to show cause why he should not be held in

Nangle did not pay any portion of the fine. On the same date that the Contempt Order was entered, but later in the day, Nangle filed a Chapter 7 petition. He claims that he appealed from the Contempt Order, and that his appeal was dismissed by the Missouri Court of Appeals as being premature. However, there is no evidence in the record to support the contention that there was an appeal, or that it was dismissed.

C. The Summary Judgment

On March 31, 2000, Siemer commenced an adversary proceeding against Nangle, pursuant to 11 U.S.C. § 523(a)(6) and (a)(7), seeking to adjudicate the debts allegedly owed Siemer, for the Illinois Judgment and Contempt Order, nondischargeable.

On June 16, 2000, the bankruptcy court entered an order granting Siemer's motion for summary judgment, determining the debts owed her were nondischargeable under 11 U.S.C. § 523(a)(6), but not ruling on Siemer's § 523(a)(7) claim. In granting summary judgment, the bankruptcy court applied Missouri collateral estoppel law, to both the Illinois Judgment and the Missouri Contempt Order, to find that the respective state court rulings had determined that the debts owing Siemer arose from "willful and malicious" injuries by Nangle against Siemer. Nangle filed a timely notice of appeal from the bankruptcy court's order.

DISCUSSION

We review the bankruptcy court's grant of summary judgment de novo. *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000); *First Bank of Marietta v. Hogge*, 161 F.3d 506, 510 (8th Cir. 1998). Siemer is entitled to summary judgment if she can prove that there is no dispute as to a genuine issue of material fact, and that she is entitled to judgment as a matter of law. *Clark*, 205 F.3d at 1082; *Hogge*, 161 F.3d at 510. We apply the substantive law of the forum states, Missouri and Illinois. *Clark*, 205 F.3d at 1082. We review de novo the bankruptcy court's application of those laws, and if the state law is ambiguous, we predict how the highest court of the state would resolve the issue. *See id.*; *First Colony Life Ins. Co. v. Berube*, 130 F.3d 827, 829 (8th Cir. 1997).

---

contempt for his failure to appear at a hearing regarding the discovery of his assets. Nangle failed to appear at the show cause hearing and the court found him in contempt.

*"Willful and Malicious" Under § 523(a)(6)*

Section 523(a)(6) provides that a debt is nondischargeable where the debt is "for willful and malicious injury by the debtor to another entity . . . ." 11 U.S.C. § 523(a)(6). In order to prevail on her dischargeability claim, Siemer must prove, by a preponderance of the evidence, that the debts resulted from willful and malicious injuries by Nangle. *See Grogan v. Garner*, 498 U.S. 279 (1991); *Fischer v. Scarborough (In re Scarborough)*, 171 F.3d 638, 641 (8th Cir. 1999). Beginning with its opinion in *Barclays American/Bus. Credit, Inc., v. Long (In re Long)*, 774 F.2d 875 (8th Cir. 1985), the Eighth Circuit has long held that "willful" and "malicious" are two separate and distinct elements which must be proven in order for § 523(a)(6) to apply. *See Scarborough*, 171 F.3d at 641; *Allstate Ins. v. Dziuk (In re Dziuk)*, 218 B.R. 485, 487-88 (Bankr. D. Minn. 1998).

In *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57 (1998), the United States Supreme Court held that the term "willful," as used in § 523(a)(6), requires more than intent to do the act that causes injury; instead, Siemer must show that the defendant intended the injury. *Geiger*, 523 U.S. at 61-63, *aff'g* 113 F.3d 848 (8th Cir. 1997). Reckless or negligent conduct is not sufficient. *See Geiger*, 523 U.S. at 977; *Barclays*, 774 F.2d at 881. The Supreme Court noted, with approval, the Eighth Circuit's acceptance of the Restatement (Second) of Torts' construction of an "intentional tort" to define the willful requirement of § 523(a)(6). *See Geiger*, 523 U.S. at 977. In *Geiger*, the Eighth Circuit stated:

> We therefore think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on 'the consequences of an act rather than the act itself.' *Restatement (Second) of Torts* § 8A, comment a, at 15 (1965). Unless the actor '*desires to cause the consequences of his act, or . . . believes that the consequences are substantially certain to result from it*,' he . . . has not committed an intentional tort. *Id.* § 8A at 15.

*Geiger*, 113 F.2d at 852 (emphasis added); *see also Long*, 774 F.2d at 881 (stating that under this definition of "willful," the injury "must be 'certain or substantially certain' to occur") (citation omitted).

The Supreme Court stated that the term "willful" in § 523(a)(6) modifies the word "injury," "indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. *Geiger*, 523 U.S. at 61. An "injury" has been defined in the

Restatement (Second) of Torts to mean "the invasion of any legally protected interest of another." *Restatement (Second) of Torts* § 7(1). The type of conduct which justifies the "denial of a debtor's discharge under § 523(a)(6) requires the same type of intentional conduct that would give rise to liability for an ordinary intentional tort." *Thompson v. Kelly (In re Kelly)*, 238 B.R. 156, 160 (Bankr. E.D. Mo. 1999). For example, debts arising from traditional intentional torts such as assault and battery have generally been held nondischargeable under § 523(a)(6). *See Kelly*, 238 B.R. at 160.

Thus, to demonstrate that the injury was willful, Siemer must show that she suffered injury, the invasion of her legally protected interest, as a result of an intentional tort by Nangle. *See Geiger*, 113 F.2d at 852; *Dziuk*, 218 B.R. at 487-88.

Siemer must also prove that Nangle's conduct was "malicious." In the Eighth Circuit, this means that she must show that his conduct was "targeted at [Siemer] . . . at least in the sense that the conduct is certain or almost certain to cause . . . harm."[7] *See Scarborough*, 171 F.3d at 641 (citations omitted); *Dziuk*, 218 B.R. at 487. Nangle must have acted with the intent to harm Siemer. *Scarborough*, 171 F.3d at 641. The Restatement (Second) of Torts defines "harm" as "the existence of loss or detriment in fact of any kind to a person resulting from any case." *Restatement (Second) of Torts* § 7(2). To prove malice, circumstantial evidence of the debtor's state of mind can be used. *See Johnson v. Miera (In re Miera)*, 926 F.2d 741, 744 (8th Cir. 1991).

To summarize, to prevail under § 523(a)(6), a plaintiff must show that the defendant intended both the "injury" and the "harm" (as those terms are defined in §§ 7(1) and 7(2) of the Restatement (Second) of Torts respectively).

In this case, the bankruptcy court applied the doctrine of collateral estoppel to determine that both the Illinois Judgment and Contempt Order debts arose from willful and malicious conduct by Nangle which caused Siemer injury. The Supreme Court has previously held that the doctrine of collateral estoppel applies in bankruptcy to bar the relitigation of factual and legal issues which were previously determined by a state court. *See Miera*, 926 F.2d at 743 (citing *Grogan*, 498 U.S. 279, 111 S. Ct. 654, 658

---

[7] Neither the Eighth Circuit's construction of the term "malicious," nor the determination that "willful" and "malicious" are distinct prongs of § 523(a)(6), was an issue in *Geiger*, and therefore, the Supreme Court's ruling did not address it. *See Geiger*, 523 U.S. 57.

6

n.11).  To determine whether collateral estoppel applies, we look to the substantive law of the forum state and give preclusive effect to the state court judgment if state law would do so.  *See* 28  U.S.C. § 1738; *Scarborough*, 171 F.3d at 641.  Therefore, we must look to the collateral estoppel law of Illinois and Missouri, respectively.

### *The Illinois Judgment*

The Supreme Court of Illinois has determined that the "minimum threshold requirements for the application of collateral estoppel . . . are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Talarico v. Dunlap*, 685 N.E.2d 325, 328 (Ill. 1997).  In addition, even if the threshold requirements are met, Illinois will not apply collateral estoppel to preclude parties from presenting their claims or defenses if unfairness would result to the party being estopped.  *See id.*

There is no dispute that the Illinois Judgment was a final judgment on the merits, or that Nangle was a party to that judgment.[8]  The dispute is whether the willfulness and maliciousness of Nangle's conduct were issues determined by the Illinois Judgment.

The jury verdict in favor of Siemer does not state whether it was based upon Count I (federal claim) or Count II (federal and state claims combined) of the complaint.[9]  Although, the type of damages awarded, for "mental distress, embarrassment . . .," "deprivation of the use of property," and "exemplary

---

[8]  Nangle attacks the appropriateness of the Illinois Judgment and asserts various legal errors allegedly committed by the state court.  However, that judgment is final and Nangle may not use the bankruptcy proceeding to collaterally attack it.

[9]  The verdict is on "Verdict Form A" and it states: "[w]e, the Jury, find for [Siemer] and against [Nangle]."  Damages were assessed "in the sum of $27,000.00, itemized as follows:

| | |
|---|---|
| Mental distress, embarrassment, shame and humiliation: | $6,000.00 |
| Deprivation of the use of property: | $1,000.00 |
| Exemplary damages: | $20,000.00" |

(App. 63).  The court also awarded attorneys' fees and costs.

damages," indicate that the verdict was based upon a jury finding that Nangle's actions violated the Illinois Consumer Fraud and Deceptive Business Practices Act (contained within Count II).[10] Further, punitive damages were awarded. The FDCPA does not provide for punitive damages, but punitive damages may be awarded if the Illinois CFDBPA is violated. *Cf.* 15 U.S.C. § 1692k(a), with 815 Ill. Rev. Stat., 121 ½, ¶ 270a(a) (current version at 815 Ill. Comp. Stat. 505/10a) (which provides that damages recoverable under the CFDBPA in a private cause of action include "actual damages or any other relief which the court deems proper"; Illinois courts have interpreted this to include punitive damages[11]). Accordingly, the jury must have determined that Nangle violated the state consumer fraud statute.

The jury instructions regarding Count II of the complaint, together with the jury's verdict, demonstrate that the Illinois Judgment conclusively determined that Siemer suffered injury as a result of willful and malicious conduct by Nangle.

The jury instructions under Count II required the jury to find that Nangle "wilfully [sic] and wantonly violated the Illinois [Consumer Fraud statute] in that he intentionally, knowingly or fraudulently engaged in conduct which created a likelihood of confusion and misunderstanding to the plaintiff" by doing one or more of the following activities:

> (a) Without the consent of plaintiff, or . . . a court . . ., communicated with plaintiff in connection with the collection of a debt at an unusual time which he knew or should have known to be inconvenient to plaintiff, namely, after 9:00 P.M.
> (b) Without plaintiff's consent, or . . . a court . . ., and after receiving notice that plaintiff was represented by an attorney with regard to the subject debt, and with knowledge of said attorney's name and address, communicated with plaintiff directly without the consent of plaintiff's attorney.
> (c) Used language, the natural consequences of which was to abuse plaintiff.

---

[10] Siemer's Jury Instruction No. 21 was applicable to the Illinois law. It stated that if the jury found for the plaintiff on the issue of liability, then damages must be fixed, and the categories of damages were the same as those set forth in the jury verdict form.

[11] *See, e.g., Black v. Iovino*, 580 N.E.2d 139, 149 (Ill. App. Ct. 1991) (citing *Warren v. LeMay*, 491 N.E.2d 464 (Ill. App. Ct. 1986)).

(d) Caused plaintiff's telephone to ring repeatedly and continuously.

(e) Engaged plaintiff in telephone conversations repeatedly and continuously with the intent to annoy, abuse, and harass plaintiff.

(f) By omission of the amount of the debt, deceptively and misleadingly represented the character and amount of said debt to plaintiff.

(g) Represented, expressly and by implication to plaintiff that nonpayment of her alleged debt would result in the seizure of her property when seizure was unlawful . . . .

(h) Threatened to take action against plaintiff that cannot legally be taken under Illinois [law].

(i) Falsely represented and implied that plaintiff had committed a crime or other conduct in order to disgrace plaintiff.

(j) Used false representations and deceptive means to collect or attempt to collect a debt.

(k) Threatened to take non-judicial action to effect dispossession of plaintiff's property when there was no present right to possession . . . .

(l) Failed to . . . send plaintiff [certain legally required notices].

(App. 54-56).

Jury Instruction No. 22 for Siemer stated that if the jury found Nangle's conduct "as claimed by plaintiff in Count II . . . was *wilful and wanton* and proximately *caused injury to the plaintiff*, and if you believe that justice and the public good require it, you may, in addition to any damages to which you find the plaintiff entitled, award" punitive damages. (App. 61, emphasis added). Jury Instruction No. 11 for Siemer stated that the terms "wilful and wanton" meant "a course of action which shows *actual or deliberate intention to harm*, or which, if not intentional, shows an utter indifference to or conscious disregard for a person's own *safety* and the safety of others." (App. 51, emphasis added).

Thus, by deciding in Siemer's favor on Count II and awarding punitive damages, the jury necessarily found that Nangle's conduct was "wilful and wanton." Indisputably, the consumer fraud causes of action brought by Siemer did not involve matters of "safety." Therefore, the jury necessarily found that Nangle had an actual or deliberate intent to injure; his conduct was not merely reckless or negligent. The categories of activities which the jury necessarily found he engaged in (the jury had to find Nangle did one or more of the acts in categories (a)-(l) above) are all clearly willful acts (e.g., "communicated with plaintiff," "used language," "caused plaintiff's telephone to ring," "engaged plaintiff," "threatened," . . .). We conclude that the jury's findings that Nangle violated the Illinois Consumer Fraud Act, in the manner

9

in which he violated the statute, and the jury's finding that his actions were "willful and wanton" as defined by the state court, necessarily required a finding that Nangle acted willfully within the meaning of § 523(a)(6). *See Scarborough*, 171 F.3d at 643. The jury determined that Nangle desired to cause the consequences of his act, or believed that the consequences were substantially certain to follow. *See Geiger*, 113 F.2d at 852.[12] The jury further determined that Nangle deliberately invaded a legally protected interest of Siemer's (protected under the Consumer Fraud Act). Nangle's conduct, as determined by the jury, was the equivalent of an intentional tort. *See Geiger*, 113 F.2d at 852; *Dziuk*, 218 B.R. at 487-88.

Nangle's conduct in this case, as found by the jury, could only have been targeted at Siemer. Moreover, the jury found that he specifically intended the harm: the "mental distress, embarrassment, shame and humiliation," and the "deprivation of the use of property" suffered by Siemer. Therefore, we conclude that the jury necessarily found that Nangle's actions were malicious within the meaning of § 523(a)(6).

Since Nangle fully participated in and litigated the Illinois case, no unfairness would result to him in applying collateral estoppel to the Illinois Judgment. Therefore, we hold that the bankruptcy court correctly applied the doctrine of collateral estoppel to determine that the Illinois Judgment is nondischargeable under § 523(a)(6).

---

[12] In regards to the enumerated categories of conduct which trigger a statutory violation (a-l, *supra*), the instructions concerning the federal FDCPA were identical. A jury instruction, offered by Nangle, further mandated that the jury could not find him liable under Count I unless his violation of the FDCPA was "intentional." Thus, the § 523(a)(6) analysis and result would be the same if the jury had determined that debtor's actions violated the FDCPA.

On appeal, Nangle seemed to suggest that because there was a jury instruction mandating that the jury could only find a violation under Count I if it found his conduct "intentional," if the jury ruled in Siemer's favor instead on Count II, but not Count I, this could only mean that the jury did not find his conduct "intentional." This argument is without merit. First, as we discussed, under Count II the jury must have necessarily found that Nangle's conduct was willful - an intentional tort. Second, the FDCPA contained additional requirements that the Illinois statute did not have. For example, the jury would have been required to find that Nangle was a "debt collector" within the statutory definition of the FDCPA. *See* 15 U.S.C. § 1962a(6); App. at 52. The record is silent as to whether or not the jury made any findings concerning the FDCPA's requirements.

*The Missouri Contempt Order*

In Missouri, the courts apply four factors in determining whether to apply collateral estoppel: "(1) the issues in the present case and the prior adjudication must be identical; (2) the judgment in the prior adjudication must be on the merits; (3) 'the party against whom collateral estoppel [is] asserted [must have been] the same party or in privity with a party in the prior adjudication;' and (4) ' the party against whom collateral estoppel is asserted [must] have [had] a full and fair opportunity to litigate the issue in the prior suit.'" *Scarborough*, 171 F.3d at 641-42 (alterations in original) (citing *State v. Nunley*, 923 S.W.2d 911, 922 (Mo. 1996) (en banc)). The requirement that the prior judgment be "on the merits" incorporates the requirement that it be a final judgment on the merits. *See Scarborough*, 171 F.3d at 642; *Nunley*, 923 S.W.2d at 922.

Elements three and four are not in dispute here. However, there is nothing in the record to demonstrate that the Contempt Order was a final judgment on the merits. Further, we cannot conclude that the issues presented are identical.

Missouri law treats the appealability, and finality, of "civil" versus "criminal" contempt orders very differently. A conviction for criminal contempt is not reviewable on appeal. *Teefey v. Teefey*, 533 S.W.2d 563, 565 (Mo. 1976) (en banc). Instead, remedies for criminal contempt orders are writs of habeas corpus or of prohibition. *See State ex. rel. Chassaing v. Mummert*, 887 S.W.2d 573, 577 (Mo. 1994) (en banc); *Int'l Motor Co., v. Boghosian Motor Co.*, 870 S.W.2d 843, 848 (Mo. Ct. App. 1993). A civil contempt order, on the other hand, is appealable. *Teefey*, 533 S.W.2d at 565. But a civil contempt order may not be appealed *until* the order has been enforced, such as by incarceration or by executing on the fine.[13] *See Bailey v. Amon*, 941 S.W.2d 657, 658 (Mo. Ct. App. 1997) (finding that until there has been an attempt to execute on a civil contempt order, the order is interlocutory and not appealable); *Strickland v. Strickland*, 941 S.W.2d 866, 868 (Mo. Ct. App. 1997); *Boghosian*, 870 S.W.2d at 847. In order to determine whether the Contempt Order was a final judgment on the merits, we must first ascertain whether the order was a "criminal" or "civil" contempt order under Missouri law.

---

[13] Nangle claims that a civil contempt order is not appealable until the party subject to the order is *incarcerated*. That is an inaccurate characterization of Missouri law. Instead, as discussed, there must be an attempt to enforce the order, which may or may not include incarceration.

Courts in Missouri have long acknowledged that many cases have elements of both civil and criminal contempt, and that it is often difficult to discern which is presented. *See, e.g., Teefey*, 533 S.W.2d at 565-56. In addition, the trial court's designation of an order as civil or criminal is not determinative; rather, we look to the substance of the order to determine its nature. *See Teefey*, 533 S.W.2d at 565; *In re Marriage of Hunt*, 933 S.W.2d 437, 448 (Mo. Ct. App. 1996). Generally, criminal contempt is punitive in nature. Its purpose is to protect the dignity of the court and the authority of the court's decrees. *See Teefey*, 533 S.W.2d at 566; *Chem. Fireproofing Corp. v. Bronska*, 553 S.W.2d 710, 715 (Mo. Ct. App. 1977). Civil contempt is generally remedial in nature. Its purpose is to protect and aid the litigant, for whose benefit the order was made, by providing a means to coerce the other party to comply with the relief the court granted the litigant. *See Teefey*, 533 S.W.2d at 566; *K.Khan, Inc., v. Wortham*, 983 S.W.2d 539, 541 (Mo. Ct. App.1998) Accordingly, civil contempt orders frequently levy a compensatory, per diem, fine which is payable until the contemnor complies with the court's order. *See Khan*, 983 S.W.2d at 541; *Bronska*, 553 S.W.2d at 715 (stating further that fines for civil contempt should be related to the litigant's actual damages, as the purpose is remedial). However, several Missouri courts have also found that lump sum, non-per diem compensatory fines payable to the litigant may also be civil in nature, even though there is nothing the contemnor can do to comply with the underlying order and avoid the fine. *See Khan,* 983 S.W.2d at 541; *Hunt*, 933 S.W.2d at 448-49 (noting though that such fines should be related to the litigant's actual damages).

Missouri courts sometimes examine five factors in ascertaining whether a contempt order is civil or criminal: "(1) was there a private or public plaintiff; (2) did the contempt proceeding serve a punitive or remedial purpose; (3) were there special elements of contumacy; (4) was the proceeding conducted as a criminal or civil proceeding; and (5) did the defendant have the requisite intent for criminal contempt." *Hunt*, 933 S.W.2d at 448 (citing *Bronska*, 533 S.W.2d at 715); *see Teefey*, 533 S.W.2d at 565-56.

The first and fourth factors indicate the proceeding in this case was civil in nature: there is a private plaintiff and the proceeding was conducted as a civil, not criminal, proceeding. The third factor could favor a criminal contempt, since Nangle stated he was considering filing a Chapter 7 bankruptcy petition, rather than complying with the court's order. Thus, Nangle stated a preconceived intent to disobey the court order. The fifth factor concerns the necessary intent for criminal intent. A contempt cannot be criminal unless it is "willful." *See Bronska*, 533 S.W.2d at 716. Although the Contempt Order does use this language (see *infra*), that alone does not appear to be sufficient for criminal intent. "In a criminal contempt proceeding, the defendant must be advised of the charges against him, . . . and is presumed innocent until

12

proven guilty beyond a reasonable doubt." *Hunt*, 933 S.W.2d at 448 (citing *Bronska*, 533 S.W.2d at 714 n.1). The Contempt Order contains no finding that the state court applied a reasonable doubt standard to the proceeding. The fifth factor, therefore, points in favor of a civil contempt proceeding.

Examining the actual language of the Contempt Order, we find that the conflicting language used is not clear on the issue of whether this was a civil or criminal contempt order. In pertinent part, the Contempt Order states that:

(1)    Nangle's "actions were intentional, willful, wanton and designed to interfere with Plaintiff's efforts to collect the judgment entered . . . ."

(2)    "As a direct result . . ., Plaintiff has been unable to obtain the discovery and other information necessary to obtain satisfaction of the judgment entered herein. In addition, Plaintiff has incurred and will continue to incur attorney's fees and other expenses . . . ."

(3)    Nangle's "actions were without justification and evidence a contumacious disregard for the authority of this Court."

(4)    Nangle was held to be in contempt of court and a "compensatory fine" in the sum of $40,723.32, plus interest . . . at nine percent (9%) per annum from July 16, 1992, until paid in full" was levied against him. [14]

(5)    "Upon payment of said compensatory fine, [Nangle] shall have purged his aforesaid contempt. In order to allow [Nangle] an opportunity to purge his contempt . . . enforcement of this Order shall be stayed until 5:00 p.m. on February 24th, 2000. In the event that [Nangle] shall fail to purge his contempt . . ., this Order shall be enforced against him without further notice."[15]

(App. 124-25).

_____

[14] It is unclear how the state court arrived at this amount, although the parties refer to it as a "doubling" of the underlying Illinois Judgment. In her motion for contempt, Siemer requested her costs and attorneys fees, and she sought debtor's incarceration until he complied with the court's prior motion to compel certain discovery. The Contempt Order imposed a fine, but no incarceration.

[15] There is a certain amount of ambiguity in this provision. If the only way to purge the contempt is to pay the fine, staying enforcement is rather meaningless. The implication is that Nangle could purge himself of contempt in some other way, presumably by complying with the discovery order.

13

On the one hand, the language contains civil aspects in that it sets forth the harm that Nangle's actions, or inactions, caused Siemer and levies a "compensatory fine," the payment of which will "purge" debtor's contempt. On the other hand, the order is criminal in nature in that: the contempt "purge" is illusory, there is nothing Nangle can do to comply with the underlying order and avoid the fine; there is no indication that the "compensatory" fine is based upon Siemer's actual damages; and, the order state's that Nangle's contempt evidenced disregard for the court's authority. In addition, the Contempt Order is silent as to whether the fine is payable to the court, or to Siemer, although the parties assume its payable to Siemer.

However, we believe that the Supreme Court of Missouri would conclude that the subject Contempt Order was civil, rather than criminal, in nature. Despite the conflicting language, it appears to us that the contempt proceedings were primarily for Siemer's benefit, not to vindicate the court. *See Teefey*, 533 S.W.2d at 566; *Hunt*, 933 S.W.2d at 448 (concluding that primary reasons for finding the contempt civil was the "civil nature of the proceeding and the private character of the parties). The contempt proceedings were part of a discovery dispute between the parties and Nangle's contempt frustrated Siemer's efforts to obtain discovery. Further, the procedural safeguards required if the contempt was criminal in nature were not present. *See Hunt*, 933 S.W.2d at 448; *Bronska*, 533 S.W.2d at 714 n.1.

Therefore, we conclude that the Contempt Order is civil in nature rather than criminal. A civil contempt order is appealable, but not until the order has been enforced, such as by executing on the fine. *See, Teefey*, 533 S.W.2d at 565; *Bailey*, 941 S.W.2d at 657; *Strickland*, 941 S.W.2d at 868; *Boghosian*, 870 S.W.2d at 847. There is nothing in the record to show that any effort has ever been made to enforce the Contempt Order, or that the order was appealed or is in any way a final order. Accordingly, we conclude that the Contempt Order was not a final judgment on the merits for the purposes of collateral estoppel. Thus, it was improper to give the Contempt Order collateral estoppel effect.

Further, because of the conflicting language of the Contempt Order, we also cannot conclude that the issues presented by the Contempt Order are identical to those contained in the dischargeability action. Specifically, we cannot find that the Contempt Order determined that Nangle's conduct was "malicious" within the meaning of § 523(a)(6). The order contains passing language indicating that Nangle's contempt was targeted perhaps at Siemer, but also at the court. The record is insufficient to determine that the state

14

court conclusively determined that Nangle intended to harm Siemer.  *See Scarborough*, 171 F.3d at 641.[16]

We conclude that the bankruptcy court erred in giving collateral estoppel effect to the Missouri Contempt Order.  Therefore, we reverse the bankruptcy court's granting of summary judgment to Siemer on the issue of the dischargeability of the Missouri Contempt Order, and remand to the bankruptcy court for trial or other proceedings consistent with this opinion.

### Section 523(a)(7)

Siemer's motion for summary judgment also requested relief under § 523(a)(7) concerning the dischargeability of the Contempt Order.  Section 523(a)(7) provides that a debt is nondischargeable "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a government unit, and is not compensation for actual pecuniary loss . . . ."  11 U.S.C.  § 523(a)(7).  The bankruptcy court did not rule on this issue because it was unnecessary.  On remand, the bankruptcy court may consider Siemer's claim under § 523(a)(7).

### Attorney's Fees

Siemer also requested that we remand the issue of her request for her attorney's fees and costs, in the adversary proceeding, back to the bankruptcy court since the court did not rule on that request.  We are unclear of the basis for her request, but the bankruptcy court may consider it on remand.

### CONCLUSION

The order of the bankruptcy court granting Siemer's motion for summary judgment is affirmed to the extent that it determined the debt arising from the Illinois Judgment was nondischargeable pursuant to 11 U.S.C. § 523(a)(6).  However, the bankruptcy court's order is reversed to the extent it granted

---

[16]  The Contempt Order specifically states that Nangle's "actions were intentional, willful, wanton and designed to interfere with Plaintiff's efforts . . . ."  (App. 124).  In addition, Nangle filed a motion seeking to avoid compliance with the order compelling disclosure in which he stated that he was "seriously exploring the viability of filing" a petition under Chapter 7 "as an alternative to subjecting himself to this creditors [sic] proceeding."  (App. 336).  Thus, it appears that there is sufficient evidence to establish that Nangle's conduct was "willful" within the meaning of § 523(a)(6).  *See Scarborough*, 171 F.3d at 641.

summary judgment in Siemer's favor on the issue of the dischargeability of the debt arising from the Contempt Order, and we remand this matter for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE
PANEL, EIGHTH CIRCUIT.